18

United States District Court
Southern District of Texas
FILED

JUL 3 0 2001

Michael N. Milby
Clerk of Court

CIVIL ACTION NO. 01-016

---

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

BLANCA OLMOS,

Plaintiff,

v.

COASTAL TRANSPORT,

Defendant.

---

## DEFENDANT COASTAL TRANSPORT'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF

---

VINSON & ELKINS, L.L.P.
Christopher V. Bacon
Federal Bar No. 12670
State Bar No. 01493980
Attorney-in-Charge
Douglas E. Hamel
Federal Bar No. 3644
State Bar No. 08818300
2802 First City Tower
1001 Fannin
Houston, Texas 77002-6760
(713) 758-1148 (Telephone)
(713) 615-5014 (Telecopy)

ATTORNEYS FOR DEFENDANT
COASTAL TRANSPORT

CNiPDF - www.fxxiio.com

# TABLE OF CONTENTS

I.     Statement of the Case ........................................................................................... 1

II.    Statement of the Issues ........................................................................................ 2

III.   Standard of Review............................................................................................... 2

IV.    Statement of Facts................................................................................................. 3

       A.     The Sexual Harassment Allegations against Manuel Loya. .....................3

       B.     The Allegations against Manuel Garza.....................................................7

       C.     Epilogue:  Olmos' August 24, 2000 termination. ..................................10

V.     Summary of Argument ....................................................................................... 10

VI.    Argument ............................................................................................................ 11

       A.     The Sexual Harassment Claim Should be Dismissed. ...........................11

              1.     Olmos' claim that she was sexually harassed by Manuel Loya should be
                     dismissed because she failed to exhaust her administrative remedies in a
                     timely manner; consequently, her harassment claim is barred by
                     limitations. ...................................................................................11

              2.     To the extent that Plaintiff now complains of any sexual harassment that
                     occurred after August 1997, her claims fail because she failed to report
                     any such harassment to Coastal's management even though she was well-
                     aware of Coastal's sexual harassment policy and had been urged to report
                     any additional sexual harassment..................................................13

       B.     Olmos' sex discrimination claims should be dismissed. .......................15

              1.     Olmos has failed to establish a *prima facie* case of discrimination with
                     respect to her complaint about her truck assignment because it was not an
                     adverse employment condition. ....................................................16

              2.     Olmos has failed to establish a *prima facie* case of discrimination with
                     respect to her claim that she was terminated in May of 1999 because she
                     has offered no evidence that she was replaced by a male driver or that she
                     was treated differently than male drivers who had failed to report spills. .17

              3.     Olmos has failed to establish a *prima facie* case of discrimination with
                     respect to her claim that she was given fewer loads than male drivers

CSHPDF - www.fineho.com

because there is uncontroverted evidence that Olmos earned more than the average driver at the Harlingen terminal during this time period. ............. 18

VII.    Conclusion and Prayer ........................................................................................ 19

ClibPDF - www.fastio.com

# TABLE OF AUTHORITIES

**Cases**

*Burger v. Central Apartment Mgmt., Inc.*, 168 F.3d 875 (5th Cir. 1999)...................................... 16

*Burlington Industries, Inc. v. Ellerth,*
    524 U.S. 763 (1998)............................................................................................................... 13

*Catley v. Graphic Communications Int'l Union,*
    982 F. Supp. 1332 (E.D. Wis. 1997)..................................................................................... 12

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)................................................................................................................. 3

*DuPont-Lauren v. Schneider (USA In*c.*),*
    994 F. Supp. 820 (S.D. Tex. 1998)....................................................................................... 18

*Enowmbitang v. Seagate Tech., Inc.,*
    148 F.3d 973 (8th Cir. 1998) ................................................................................................ 16

*Faragher v. City of Boca Raton,*
    524 U.S. 775 (1998)......................................................................................................... 13, 14

*Griffin v. City of Dallas,*
    26 F.3d 612 (5th Cir. 1994) .................................................................................................. 12

*Kocsis v. Multi-Care Mgmt., Inc.,*
    97 F.3d 876 (6th Cir. 1996) .................................................................................................. 16

*Maniccia v. Brown,*
    171 F.3d,1368 ........................................................................................................................ 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 586 (1986)................................................................................................................. 3

*Mayberry v. Vought Aircraft Co.,*
    55 F.3d 1090 (5th Cir. 1997) ................................................................................................ 17

*McDonnell-Douglass Corp. v. Green,*
    411 U.S. 792 (1973)............................................................................................................... 15

*Nealon v. Stone,*
    958 F.2d 590 (4th Cir. 1992) ................................................................................................ 11

*Riley v. Technical & Mgmt. Servs. Corp.*
    872 F. Supp. 1459 (D. Md. 1995) ........................................................................................ 11

iii

*Sanchez v. Standard Brands, Inc.,*
    431 F.2d 462 (5th Cir. 1970) ................................................................ 11

*Skotak v. Tenneco Resins, Inc.,*
    953 F.2d 913 (5th Cir.), *cert. denied,*
    506 U.S. 832 (1992)............................................................................ 2

*St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502 (1993) ........................... 15, 17

*Williams v. General Motors, Co.,*
    187 F.3d 561 (6th Cir. 1999) ............................................................ 15

*Williamson v. City of Houston, Inc.,*
    148 F.3d 462 (5th Cir. 1998) ............................................................ 15

## Rules

Fed. R. Civ. P. 56(c) ............................................................................ 2

CVisPDF - www.texlra.com

United States District Court
Southern District of Texas
FILED

JUL 3 0 2001

Michael N. Milby
Clerk of Court

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| BLANCA OLMOS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 01-016 |
| | § | |
| COASTAL TRANSPORT, | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT COASTAL TRANSPORT'S MOTION
## FOR SUMMARY JUDGMENT

Defendant Coastal Transport ("Coastal") moves for Summary Judgment as follows:

### I.    Statement of the Case

Blanca Olmos, appearing *pro se*,  filed her Original Complaint on August 8, 2000.[1] When Plaintiff's counsel made his first appearance at the Rule 16 conference on February 22, 2001, the Court requested that he file an amended complaint specifically enumerating Plaintiff's legal claims because Plaintiff's *pro se* pleading contained only factual allegations.  Plaintiff's counsel has never filed such a pleading. However, at Plaintiff's deposition, Olmos and her counsel agreed that Plaintiff had only raised two causes of action in her lawsuit: (1) a claim that she was sexually harassed by Manuel Loya, an assistant manager who acted as a dispatcher at Coastal's Harlingen terminal, and (2) a claim that she was discriminated against because of her sex (although not sexually harassed) by Manuel Garza, the manager at the same terminal.  Depo. at 5.[2]

---

[1]  A copy is attached as Exhibit E.
[2]  All cites to "Depo. at ___" are to deposition of Blanca Olmos taken on March 22, 2001.  All cites to "Depo. Exh. _____" are to exhibits to that deposition.  Cited excerpts are attached as Exhibit A to this Brief.

The deadline for completion of discovery in this case expired on June 29, 2001. Plaintiff conducted no discovery. This case is currently set for docket call on November 1, 2001.

## II.    Statement of the Issues

1.    Whether Olmos' sexual harassment claim, based on incidents occurring more than three years before Olmos complained of sexual harassment to the Texas Commission on Human Rights, is barred by limitations.

2.    Whether Olmos can complain of sexual harassment when Coastal took reasonable care to prevent and promptly correct such conduct, and Olmos unreasonably failed to take advantage of Coastal's prevention measures

3.    Whether Olmos can bring a sex discrimination claim when she has failed to establish a prima facie case of sex discrimination either because she is complaining of actions which are not "adverse employment actions," or because she has failed to bring forth evidence that she was treated differently than male employees.

## III.    Standard of Review

Summary judgment is proper if the record reflects that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party may meet its burden of showing that there is no genuine issue for trial by pointing out the absence of evidence supporting the nonmoving party's case. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 913 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992). In responding to a motion for summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec.*

2

CoolPDF - www.fastio.com

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original). Rule 56(c) mandates "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV.  **Statement of Facts**

A.    The Sexual Harassment Allegations against Manuel Loya.

Olmos was first hired in September 1996 as a truck driver at Coastal's Harlingen terminal. Depo. at 49; Complaint at 1. At the time that she was hired, Olmos was the only female driver at the Harlingen terminal. Depo. at 48-50. However, shortly thereafter, another woman – Linda Garcia - was hired. *Id.*

In contrast to Olmos, Garcia was a very flirtatious woman who quickly began an open and consensual sexual affair with Robert Torres, a co-worker who was married. Depo. at 48-51. According to Olmos, Manuel Loya, an assistant manager and dispatcher at the Harlingen terminal, envied Torres' relationship with Garcia, and began to pursue Olmos, hoping that she would show a similar interest in him. *Id.*; Complaint at 1. Olmos, however, was not interested.

In her Complaint, Olmos offers considerable detail about Loya's behavior. She relates how Loya told her that he wanted a relationship with her that was similar to the one that Garcia was having Torres, and how, in order to curry favor with her, Loya gave her preferential treatment by letting her choose her own loads. Complaint at 1-2; Depo. at 48-50. Loya also arranged it so that they would be working together by asking Olmos (who ordinarily worked as a truck driver) to help him in the office on Sundays with his paperwork. Complaint at 1. Olmos claims that during one of these Sunday paperwork sessions, Loya kissed her. *Id.*; Depo. at 57-

3

60. Olmos never reported the kissing incident because, according to her, Loya had quickly apologized for his conduct. *Id.*; Depo. at 62.   In fact, because he had apologized, Olmos continued helping Loya with his paperwork on Sundays. *Id.;* Depo. at 64.

Although the kissing stopped, Olmos contends that Loya continued to bother her.  She claims that on her days off, Loya would call her at home and ask her out on dates.  Complaint at 3; Depo. at 73.  On one occasion, Loya allegedly came into the office drunk and told Olmos that he wanted to go out with her.  Complaint at 2.  Olmos also complains that "[m]any times, Mr. Loya would touch me and I many times pushed him away" and that sometimes "Mr. Loya would come from the back and put his arms around my hip, shoulders, and pinch my side with his hands."  Complaint at 2.  She acknowledges, however, that Loya was "very careful" never to harass her in the presence of Manual Garza, the terminal manager.  Depo. at 67, 74.

Olmos concedes that she did not complain about Loya even though she knew that Coastal had a policy prohibiting sexual harassment.  Depo. at 119.  Loya's harassment of Olmos only came to Coastal's attention because of an investigation of another employee's complaint in the summer of 1997.  Carlin Affidavit at ¶6.[3]  Linda Garcia (the employee who had been involved in the consensual relationship with Robert Torres) had complained that she had been sexually harassed by Manuel Garza, the terminal manager.  Carlin affidavit ¶4.  Coastal's human resources supervisor, Tammy Carlin, traveled to Harlingen to conduct an investigation into Garcia's allegations, where she interviewed nearly every employee at the Harlingen terminal, including Olmos.  Carlin affidavit ¶5; Depo. at 98-100.  During her interview of Olmos, Olmos told Carlin that she had never seen Garza sexually harass Garcia.  Carlin affidavit ¶6.  Moreover, when Carlin inquired if Olmos herself had been harassed by Garza, Olmos made it clear that she had not.  *Id.*  Carlin then asked her if Olmos had experienced <u>any</u> harassment at Coastal by

---

[3]  "Carlin Affidavit" refers to the Affidavit of Tammy Carlin and is attached as Exhibit B to this Brief.

anyone else. *Id.* Only then did Olmos tell Carlin that Loya had been "bothering her" by persistently asking her out on dates. Depo. at 101. Olmos did not tell Carlin, however, about the extent of Loya's attentions, nor did she describe Loya's alleged physical touching or kissing. *Id.*; Carlin affidavit ¶6. In fact, she <u>never</u> reported Loya's physical attentions to Coastal's management.

Although Olmos only told Carlin that Loya had been pestering her about going out on a date, Carlin made it very clear to Olmos that Coastal would not tolerate any form of sexual harassment and that Loya had acted inappropriately by simply asking Olmos out on a date. Depo. at 101, 119. Carlin assured Olmos that management would talk to Loya about his conduct and that it would stop. Carlin affidavit ¶7; Depo. at 101-02. Carlin also told Olmos that if she continued to have any problems with Loya that she only needed to call Carlin to report the harassment. *Id.*

Loya was promptly reprimanded and warned that any future complaints would result in his termination. *Id.*; Depo. Exh. 9, attached as Exhibit G. Olmos acknowledged that even she knew that Loya had been reprimanded because Loya had actually shown her the written reprimand that he had been given and he had told her that he had been warned that he would be fired if he continued to bother her. Depo. at 102-03. Despite her knowledge that Coastal had taken her first complaint seriously and had warned Loya about his conduct, Olmos never again complained about Loya after August 1997. Depo. at 120-21.

In her deposition, Olmos conceded that <u>all</u> of the incidents that were detailed in her Complaint occurred *before* she complained about Loya during the Linda Garcia harassment investigation in the summer of 1997. Depo. at 132-142 (discussing the timing of incidents in her Complaint). She further conceded that she did not mention Loya's harassment in her December

23, 1999 EEOC charge. Depo. at 189. In fact, in her EEOC charge, Olmos did not complain about sexual harassment at all, much less of Loya. Depo. Exh. 4, attached as Exhibit C. The complaints that were detailed in Olmos' EEOC charge related only to her claim against Manuel Garza, namely that Garza discriminated against Olmos because of her sex. *Id.* Olmos has made it clear, however, that Garza never sexually harassed her. Depo. at 45.

When Carlin received Olmos's EEOC charge in early 2000, she went to Harlingen to discuss it with Olmos. Carlin affidavit ¶10. During her conversation with Olmos, Carlin asked Olmos if she was still having problems with Loya because Olmos had not complained about Loya since August 1997. Depo. at 197; Carlin affidavit ¶10. Olmos told Carlin that she had not had any problems with Loya since her complaint nearly three years earlier. *Id.*

It was not until Olmos filed her charge with the Texas Commission on Human Rights ("TCHR"), on November 13, 2000 (after she had filed the present lawsuit), that Olmos complained again about Loya's sexual harassment. *See* Depo. Exh. 8, attached as Exhibit D. She concedes, however, that the incidents that she described to the TCHR in November 2000, concerned the same allegations discussed in her Complaint, i.e., incidents that had occurred prior to Loya's reprimand in August 1997. Depo. at 124-31 (discussing incidents in her affidavit to the TCHR), attached as Exhibit E; Depo. Exh. 5 (affidavit submitted to TCHR), attached as Exhibit F.

Although Olmos did not describe any post-August 1997 harassment in her Complaint, her EEOC charge, or her correspondence to the TCHR, in her deposition Olmos testified that Loya's harassment resumed three or four months after the Garcia investigation, when Loya started "poking" at her by making fun of her weight. Depo. at 107, 109-110. Olmos conceded, however, that Loya never again asked her out on a date after he had been reprimanded. Depo. at

6

110.[4]   As to whether she was ever kissed again, Olmos was inconsistent in her testimony, first

testifying that Loya never kissed her again after she had complained about him August 1997,

Depo. at 107, and then later recalling that Loya had kissed her on "many occasions," even after

he had been reprimanded.   Depo. at 118.   However, when asked for details of these "many"

kisses, Olmos could only recall two and she could not remember when these two kissing

incidents had occurred.   Depo. at 116-17.   Again, she conceded that she had never complained to

anyone about any harassment that occurred after August 1997, and that she had never mentioned

the kissing to anyone at any time.   Depo. at 120.

> B.      The Allegations against Manuel Garza.

Manuel Garza was, and is, the manager at the Harlingen terminal.   Depo. at 142.   Olmos

has not claimed that Garza sexually harassed her.   In fact, she made it clear in her deposition that

he had not.   Depo. at 45.   Olmos' claim against Garza is simply that he discriminated against her

because she was a woman.   Depo. at 5.

Olmos claims that she was discriminated against by Garza in the three specific ways.

First, Olmos complains that Garza discriminated against her with respect to her truck

assignments when she returned from medical leave in late March 1999.   *See* EEOC Charge,

attached as Exh. C; Depo. at 168.   Second, Olmos complains that Garza discriminated against

her when he terminated her on May 27, 1999, even though she was reinstated one week later at

the urging of Tammy Carlin.   *Id; see also* Complaint pp. 5-7.   Finally, Olmos complains that,

after being reinstated, Garza gave her fewer and less profitable loads resulting in her making less

than male drivers during the last part of 1999.   Depo. at 168; Depo. Exh. 7.

---

[4]     In fact, Olmos recalled one incident where Loya called her at home to tell her that they were not dating
anymore.   Depo. at 110.

The truck assignment issue. Olmos acknowledges that she got along well with Garza in the beginning. Depo. at 142. It appears that Olmos problems with Garza began some time after she returned from an extended three-month medical leave at the beginning of 1999. Depo. at 179.

At Coastal, drivers were assigned trucks by seniority. Depo. at 172. The most senior drivers were assigned specific trucks while more junior drivers were assigned whatever truck was available that day. *Id.* Prior to Olmos' medical leave in 1999, because of her seniority, she had been assigned to a specific truck. Depo. at 177-78. However, because she had been out for an extended period of time, when she returned from her medical leave, her old truck had been reassigned to someone else. Depo. at 172-173, 179.

Coastal's management first learned of Olmos' allegation of discrimination regarding the truck assignment when it received Olmos' EEOC charge (*see* Exh. C) which had been filed on December 23, 1999. Carlin affidavit ¶10. Carlin investigated Olmos' complaint that she had been discriminated in the assignment of trucks, and concluded that Garza's policy of not reassigning drivers to their former trucks whenever they were out on extended leave, had not been applied in a discriminatory fashion. Carlin affidavit ¶10, 11. However, believing that it was unfair to penalize drivers who had been out for no fault of their own, Coastal's management ordered Garza to change his policy and to reassign Olmos to the truck that she had been assigned to prior to going out on medical leave. Carlin affidavit ¶11; Depo. at 190, 196-197.

The May 27, 1999 termination. On April 14, 1999, shortly after returning from her medical leave, Olmos intentionally drained between 10 and 15 gallons of fuel in the middle of the yard at the Harlingen terminal. Depo. at 152-53; Depo. Exh. 15. Because she had not

8

properly disposed of the fuel, Olmos was warned that another incident like this would result in her termination. *Id.*

On May 20, 1999, five weeks after she had been warned for spilling fuel in the yard, Olmos had an accidental spill at a Circle K in Brownsville, Texas. Carlin affidavit ¶9. Although Olmos called the office and reported that she was having some problems with her truck, she did not tell the dispatcher who was on duty, that there had been a spill. *Id.* Because of her failure to report the spill, Garza terminated her. *Id.;* Depo. at 161-162. .

After Olmos was terminated, she called to complained to Tammy Carlin. *Id.* After talking to the dispatcher who had been on duty, Carlin concluded that Olmos had not reported the spill. *Id.* However, Carlin also determined that Olmos had reported having some problem with the her delivery although she had not indicated the gravity of the problem or that the problem had been a spill. *Id.* While Olmos' failure to specifically report the spill had been in clear violation of company policy, Carlin recognized that her failure may have been a result of Olmos' poor communication skills and not a deliberate decision to conceal the spill. *Id.* Consequently, based on Carlin's recommendation, Coastal rescinded its decision to terminate Olmos and reinstated her. *Id.* The five days that Olmos had missed, however, were treated instead as a suspension without pay. *Id.*

Olmos' allegation that she was discriminated against with respect to her pay. Finally, Olmos claims that from May 1999 through December 1999, she was given fewer opportunities to make money than her male counterparts. Depo. at 168, 204-205; EEOC charge, attached as Exh. C. However, Coastal's pay records for the second half of 1999 demonstrate that Olmos was actually earning more than the average driver. *See* Carlin affidavit ¶12 and payroll records attached to Carlin affidavit, attached as Exhibit B.

9

C.     Epilogue: Olmos' August 24, 2000 termination.[5]

On May 5, 2000, Olmos was injured when a fuel pump "burped" and splashed fuel all over her while she was delivering fuel at Tex Mart store in San Benito, Texas.  Depo. at 9-11. She was placed on unpaid leave for 13-weeks, in accordance with Coastal's leave policy.  Depo. at 17.  On August 24, 2000, at the end of the 13-week period, Olmos was terminated because she was still not able to return to work at that time.  Carlin affidavit ¶13.  However, because her injury had occurred at work, Olmos continued to receive worker's compensation benefits through October of that year.  Depo. at 20.  Olmos was advised that she could reapply for employment but that she would need to fill out an application for employment first.  Carlin affidavit ¶13; Depo. at 35-36.  Olmos has never done this.  *Id.*

## V.     **Summary of Argument**

Coastal moves for summary judgment on Olmos' claim of sexual harassment because she failed to exhaust her administrative remedies in a timely fashion resulting in that claim being barred by limitations.  Coastal moves for summary judgment on Olmos' claim of sexual discrimination because she has failed to establish a *prima facie* case of sex discrimination and because she has offered no evidence that Manuel Garza treated her differently from similarly situated males.

---

[5]   Olmos does not complain of her August 24, 2000 termination in her lawsuit and she has never claimed that the August 24, 2000 termination was motivated by her sex.  However, it is discussed here to avoid any confusion with Olmos' May 1999 termination, which Olmos has complained about in her lawsuit.

## VI.   **Argument**

A.   The Sexual Harassment Claim Should be Dismissed.

1.   Olmos' claim that she was sexually harassed by Manuel Loya should be dismissed because she failed to exhaust her administrative remedies in a timely manner; consequently, her harassment claim is barred by limitations.

Olmos filed her lawsuit in this Court on August 8, 2000. At the time, Olmos had only filed a single EEOC charge on December 23, 1999, for which she had received a right to sue letter on May 12, 2000. *See* Exh. C. In that charge, Olmos made no claim that was sexually harassed by Manuel Loya. *Id.*; *see also,* Depo. at 189. In fact, in that charge, Olmos did not allege sexual harassment of any type. *Id.* Olmos simply complained that she was discriminated against when she was terminated on May 27, 1999 (a termination which was rescinded 5 days later), and that she was discriminated against with respect to assignment of trucks and loads, resulting in her earning less that similarly situated male employees. *Id.*

The "crucial element of a charge of discrimination is the factual statement contained therein." *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 462 (5th Cir. 1970). Courts may only exercise jurisdiction over claims encompassed within the EEOC charge and claims related to those claims. *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992). The EEOC was only given notice of Plaintiff's claims of sex discrimination, not her claims of sexual harassment. *See* Exh. C. They are distinct claims and are not related. Because Olmos did not complain of sexual harassment in her EEOC charge, to the extent that her federal lawsuit is based on that charge, summary judgment is appropriate on her claim of sexual harassment. *See Riley v. Technical & Mgmt. Servs. Corp.* 872 F. Supp. 1454, 1459 (D. Md. 1995) (granting summary judgment on sexual harassment and hostile environment claim because Plaintiffs only complained of sex

11

discrimination in their EEOC charge), *aff'd*, 79 F.3d 1141 (4th Cir. 1996); *Catley v. Graphic Communications Int'l Union*, 982 F. Supp. 1332 (E.D. Wis. 1997) (summary judgment appropriate because sexual harassment claim not raised in EEOC charge).

Olmos filed a second charge of discrimination with the Texas Commission on Human Rights on November 15, 2000, after she had filed her EEOC charge and the present lawsuit. In contrast to her EEOC charge, in her TCHR charge Olmos did complain that she had been "subjected to unwelcome sexual comments by Mr. Manuel Loya." *See* Exh. D. However, assuming that Olmos could use this belatedly filed charge to support her claim of sexual harassment, it is nonetheless barred by limitations because Olmos has acknowledged that the harassment that she was complaining about to the TCHR and in her Complaint occurred back in 1997. Depo. at 124-142. Because her TCHR charge was filed on November 13, 2000, she cannot complain about any harassment that occurred prior to January 15, 2000, or 300 days prior to November 15, 2000 filing of the charge.[6]   42 U.S.C. § 2000e-(5)(e)(1 (the statute of limitations for a claim brought under Title VII is 300 days from the filing of the Plaintiff's charge of discrimination). *Griffin v. City of Dallas*, 26 F.3d 610, 612-13 (5th Cir. 1994) (same). Accordingly, Olmos' claim of sexual harassment is barred by limitations and should be dismissed.

---

[6]    Considering that Olmos' last day at work was May 5, 2000, she would have to show that some actionable harassment took place in a three and a half month period prior to her last day of work. She has not done so.

2.  <u>To the extent that Plaintiff now complains of any sexual harassment that occurred after August 1997, her claims fail because she failed to report any such harassment to Coastal's management even though she was well-aware of Coastal's sexual harassment policy and had been urged to report any additional sexual harassment.</u>

Olmos acknowledges that all of the sexual harassment within the statute of limitations described in her Complaint occurred prior to her complaint about Loya during the Linda Garcia sexual harassment investigation in August 1997.  Depo. at 132-42.  She also acknowledges that all of the sexual harassment described in her memorandum to the Texas Commission on Human Rights (which was filed after this lawsuit was filed!) also occurred before she complained about Loya in August 1997.  Depo. at 124-131.  In fact, there is no mention of any sexual harassment that occurred after August 1997 in her Complaint, her EEOC charge or her TCHR charge, or the memorandum that she prepared for the TCHR.  Depo. at 124-142, 189.

Notwithstanding her failure to document any instance of harassment within the statute of limitations, Olmos testified in her deposition that Loya continued to sexually harass her after she complained about him in the summer of 1997, although she was vague as to when this harassment occurred and failed to show that it occurred within 300 days of her filing her charge with the TCHR.  Nevertheless, assuming *arguendo* that one of these incidents occurred within the statute of limitations, Olmos' sexual harassment claim still fails because Coastal took reasonable care to prevent and to promptly correct any sexually harassing behavior by Loya, and Olmos unreasonably failed to take advantage of any preventive or corrective opportunities by Coastal.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 763-64 (1998).

13

Olmos does not dispute that Coastal had a sexual harassment policy that instructed employees to report sexual harassment to company management. Depo. at 119. Moreover, Olmos concedes that the one time that she did report sexual harassment, in August 1997, Coastal took action by warning the alleged harasser that any future complaints about him would result in his termination. Depo. at 101-02. Furthermore, Olmos acknowledges that Tammy Carlin, the human resource supervisor, urged her to report any further incidents of harassment. *Id*. Because the Supreme Court has held that an employer cannot be held liable (1) if the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) the employee unreasonably failed to take advantage of the employer's preventive opportunities, Olmos' claims, even if timely, fail. *Faragher*, 524 U.S. at 763-64.

Despite Carlin's urgings, Olmos never again complained about Loya after her initial complaint. Depo. at 120-121. In fact, not only did Olmos not complain to Coastal about Loya's harassment, she failed to mention it to the Equal Employment Opportunity Commission when she filed her charge December 1999. Depo. at 189. Additionally, even though her EEOC charge did not allege any harassment, when Carlin received Olmos' EEOC charge and met with Olmos to discuss her allegations that she had been discriminated against by Garza, Carlin asked Olmos if Loya had harassed her since she had last complained about him in 1997. Carlin affidavit ¶10. Olmos admits that she told Carlin that Loya was no longer harassing her. Depo. at 197. Hence, there is no evidence that Coastal had any knowledge of any sexual harassment subsequent to August 1997.

In order for Olmos to prevail on a claim that she was sexually harassed by a co-worker, she must show that Coastal "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate action." *Williams v. General Motors, Co.*, 187 F.3d

14

553, 561 (6th Cir. 1999); *Williamson v. City of Houston, Inc.*, 148 F.3d 462 (5th Cir. 1998). Coastal cannot be deemed to have even had knowledge of Loya's harassment after August 1997 when Olmos not only failed to report the harassment but, when asked if she was being harassed, she had said that she was not. Thus, to the extent that there was any actionable harassment within the statute of limitations, (and Olmos has failed to show this), Olmos' sexual harassment claim still fails because Olmos failed to give notice to Coastal of that sexual harassment.

        B.      Olmos' sex discrimination claims should be dismissed.

Olmos' sex discrimination claim is analyzed under the burden-shifting framework first established in *McDonnell-Douglass Corp. v. Green*, 411 U.S. 792 (1973). Under this analysis, the initial burden of establishing a prima facie case of discrimination lies with the Plaintiff. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). If the Plaintiff establishes a *prima facie* case, the defendant must articulate a legitimate non-discriminatory business reason for the challenged action. *Id.* at 506-08. An employer need not prove the legitimate reason. It need only produce some evidence to support its reason. *Id.* Once the defendant articulates such a reason, the plaintiff is then accorded the opportunity to demonstrate that the defendant's articulated reason is a pretext for discrimination. *Id.*

Olmos complains that Garza discriminated her in three ways: (1) by not reassigning her the old truck when she returned from medical leave in 1999; (2) by terminating her in May 1999, and (3) by paying her less than similarly situated male drivers in the last part of 1999. None of these allegations supports a *prima facie* case of discrimination.

15

1. Olmos has failed to establish a *prima facie* case of discrimination with respect to her complaint about her truck assignment because it was not an adverse employment condition.

With respect to Olmos' complaint about her truck assignment, Olmos has failed to establish a *prima facie* case of discrimination because the failure to reassign her to her old truck did not amount to an "adverse employment action," under Title VII. Actions not affecting pay are generally not "adverse." See, e.g., *Enowmbitang v. Seagate Tech., Inc.*, 148 F.3d 970, 973-74 (8th Cir. 1998) (failure to provide plaintiff with computer and issuance of poor evaluation were not adverse employment actions); *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886-87 (6th Cir. 1996) (nurse's transfer was not adverse because it did not entail loss of pay, duties, or prestige).

The Fifth Circuit has limited "adverse employment actions" to those which are "ultimate" employment decisions. *Burger v. Central Apartment Mgmt., Inc.*, 168 F.3d 875, 879 (5th Cir. 1999) (refusing request for lateral transfer is not ultimate employment decision). Under either test, Olmos' complaint about her truck assignment is not an "adverse employment action." It is no different from an employee's complaint that he has been given a less favorable office or parking space. While these decisions may be unfair or even discriminatory, they are not the type of decisions that can be litigated under Title VII. Otherwise, the courts would be flooded with discrimination lawsuits. Accordingly, Olmos has failed to establish a *prima facie* case of sex discrimination with respect to her complaint about her truck assignment, because it is not an "ultimate employment action."

16

2.   Olmos has failed to establish a *prima facie* case of discrimination with respect to her claim that she was terminated in May of 1999 because she has offered no evidence that she was replaced by a male driver or that she was treated differently than male drivers who had failed to report spills.

While Olmos' termination in May of 1999 could be deemed "adverse employment action," even though it was rescinded five days later, it does not support a *prima facie* case of discrimination because Olmos has failed to offer any evidence that she was replaced by a male driver or that male drivers who failed to report spills were treated differently.

In order to establish a *prima facie* case of discriminatory discharge, in addition to showing that the plaintiff was (1) a member of the protected class, (2) was qualified for the position, and (3) discharged, a plaintiff must show that she was replaced by a person outside of the protected group. *Hicks,* 509 U.S. at 506. There is no evidence that Olmos was replaced by a male employee. In fact, she was rehired five days after her discharge.

While in some types of cases (RIF cases, for example), courts have dispensed with the "replacement" requirement, they still have required plaintiffs to produce some other direct or circumstantial evidence of discrimination. *See, e.g., Maniccia v. Brown,* 171 F.3d, 1364, 1368 (plaintiff failed to establish *prima facie* case because she failed to identify male employee who was discharged for same reason). For example, a Plaintiff might establish a *prima facie* case by showing she was treated worse than similarly situated employees outside of the protected class. *Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1090 (5th Cir. 1997) (plaintiff could establish a *prima facie* case in a work-rule violation case by showing that white employees were treated differently under "nearly identical" circumstances). Although Olmos has claimed that other drivers had spills and were not terminated, she has failed to understand that she was terminated not because of her accidental spill, but because she failed to clearly communicate the spill to her

17

superiors. Olmos has offered <u>no</u> evidence of male drivers who had <u>not</u> been similarly disciplined for failing to report a spill. Thus, Olmos has failed to establish a *prima facie* case of discrimination with respect to her five-day suspension in May 1999.

<blockquote>
3.    <u>Olmos has failed to establish a *prima facie* case of discrimination with respect to her claim that she was given fewer loads than male drivers because there is uncontroverted evidence that Olmos earned more than the average driver at the Harlingen terminal during this time period.</u>
</blockquote>

Olmos cannot base her Title VII claim on her belief that she was given assignments that she considered less desirable if these assignments did not result in her making less than similarly situated male drivers. *See, e.g., DuPont-Lauren v. Schneider (USA In*c.*)*, 994 F. Supp. 802, 820 (S.D. Tex. 1998) (assigning fewer senior sales representatives to plaintiff's region and selecting fewer hospitals in her region for test of new product are not adverse employment actions). She must offer evidence that she was paid less. Although Olmos claims that she was given fewer loads than male drivers, resulting in her making less during the last part of 1999, this claim is not supported by any evidence. In fact, the actual pay records for the second half of 1999 demonstrate that Olmos actually earned more than the average driver. *See* Carlin affidavit ¶12 and payroll records attached to Carlin affidavit. Hence, Olmos has failed to establish a *prima facie* case of discrimination with respect to her pay.

18

## VII.   Conclusion and Prayer

Olmos claim that she was sexually harassed by Loya should be dismissed because she failed to timely raise that complaint with the EEOC or the TCHR.   Accordingly, any claim of sexual harassment is barred by limitations.   Insofar as her claim of sex discrimination against Garza is concerned, Olmos has failed to establish a *prima facie* case of discrimination. Accordingly, that claim should be dismissed as well.   For these reasons, Coastal requests that Olmos' claims against Coastal be dismissed in their entirety.

Respectfully submitted,

CHRISTOPHER V. BACON
Federal Bar No. 12670
State Bar No. 01493980
Attorney-in-Charge
DOUGLAS E. HAMEL
Federal Bar No. 3644
State Bar No. 08818300
2802 First City Tower
1001 Fannin
Houston, Texas 77002-6760
(713) 758-1148 (Telephone)
(713) 615-5014 (Telecopy)

ATTORNEYS FOR DEFENDANT
COASTAL TRANSPORT

## CERTIFICATE OF SERVICE

I certify that on the 27 day of July, 2001, a correct copy of the Defendant's Motion for Summary Judgment and Memorandum in Support Thereof has been served on Plaintiff by telecopy and by placing same in the United States mail, certified, return receipt requested, with proper postage affixed and addressed as follows:

Sergio Sierra
1325 Palm Blvd., Suite B
Brownsville, Texas
(956) 544-4761 (Telecopy)

*Christopher V Bacon*

Attorney for Defendant

592064_1.DOC

20

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

BLANCA OLMOS, §
§
Plaintiff, §
§
vs. § CIVIL ACTION NO. 01-016
§
COASTAL TRANSPORT, §
§
Defendant. §

## ORDER

On this date, the Court considered Defendant's Motion for Summary Judgment. The Court finds there are no material fact issues on any of Plaintiff's claims. Therefore, it is ORDERED that the Defendant's Motion for Summary Judgment is granted and Plaintiff's claims of sex discrimination and sexual harassment are dismissed in their entirety.

SIGNED this _____ day of _____, 2001.


_____
UNITED STATES DISTRICT JUDGE

1

# APPENDIX

A.  Excerpts to Blanca Olmos Deposition

B.  Carlin Affidavit with Exhibits

C.  EEOC charge filed 12/23/99 (Deposition Exhibit 7)

D.  TCHR charge filed 11/13/00 (Deposition Exhibit 8)

E.  Complaint (Deposition Exhibit 4)

F.  Olmos Memorandum to the TCHR (Deposition Exhibit 5)

G.  Loya Reprimand (Deposition Exhibit 9)

613465_1.DOC

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

BLANCA OLMOS,         )(
      Plaintiff     )(
                 )(
VS.               )(   CIVIL ACTION NO. 01-016
                 )(
COASTAL TRANSPORT,   )(
      Defendant     )(

_____

ORAL DEPOSITION OF
BLANCA OLMOS
MARCH 22, 2001

_____

      ORAL DEPOSITION OF BLANCA OLMOS, produced as a
witness at the instance of the DEFENDANT, taken in the
above styled and numbered cause on MARCH 22, 2001,
reported by DONNA McCOWN, Certified Court Reporter
No. 6625, in and for the State of Texas, at the offices
of Sergio Sierra, 1325 Palm Boulevard, Suite B,
Brownsville, Texas, pursuant to the Texas Rules of
Civil Procedure.



BRYANT & STINGLEY, INC.
McAllen      Harlingen     Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

A. Yes, sir.

Q. You understand we are here today to take your deposition related to a lawsuit that you have filed in federal court?

A. Yes, sir.

MR. BACON: And it's my understanding -- and this is really more directed to your lawyer -- the claims that Ms. Olmos has asserted are claims that she was discriminated on the basis of her sex and sexually harassed while working at Coastal Transport.

MR. SIERRA: That's correct, Counsel.

MR. BACON: And the reason I raise that is that there hasn't been actually an amended pleading yet, but we're proceeding with this deposition under the impression that those are the claims that she's asserting, and that's what I'm going to limit my questioning to is those two claims.

She's not raising any claims of national origin or race discrimination in this case; is that correct?

MR. SIERRA: That's correct, Counsel.

Q. Ms. Olmos, I want -- since you've never had your deposition taken before, I want to, you know, establish some guidelines to help us through this morning.

```
09:15:49  1      Q.  Do you like your new job?

09:15:51  2      A.  Yes.

09:15:52  3      Q.  Okay.  Do you like your new job better than

09:15:54  4   your job at Coastal?

09:15:56  5      A.  No.  I like Coastal better.

09:15:58  6      Q.  Why do you like your job at Coastal better than

09:16:01  7   your job at Suttles?

09:16:04  8      A.  One, I had all my benefits; two, it was good

09:16:08  9   pay, and because I knew my job.

09:16:33 10      Q.  Have you -- let's -- you were not able to work

09:16:40 11   for some time period; is that correct?

09:16:42 12      A.  Uh-huh, right.

09:16:47 13      Q.  I'd like you to talk to me a little bit about

09:16:57 14   what caused you to have the injury that required you to

09:16:57 15   take medical leave.

09:16:59 16      A.  Okay.  The undertank from the store, it burped,

09:17:04 17   and the gas splashed and came onto my eyes and inside

09:17:09 18   my lungs, and I ended in the hospital, and the doctor

09:17:12 19   didn't release me until -- he couldn't release me.  He

09:17:19 20   said I wasn't ready to go back to work.

09:17:21 21      Q.  Do you remember when that happened?

09:17:23 22      A.  Yes.  In May 5th, I think it was 2000 -- May

09:17:32 23   6th.

09:17:33 24      Q.  May 5th or May 6th?

09:17:35 25      A.  Yeah.
```

Q.   One of those two days?

A.   Si.

Q.   Do you remember approximately what time of the day?

A.   Yes.  It was on a Sunday.  It was 10 till 5:00 in the afternoon.

Q.   So it was Sunday May 5th or May 6th, whatever fell on a Sunday?

A.   Si.

       MR. SIERRA:  Excuse me, Counsel.  Blanca, just to remind you, I know here in the Valley sometimes we tend to speak Spanglish where we mix English and Spanish, but the court reporter can only take down the English.  Make sure you answer in English.

       THE WITNESS:  Okay, sir.

Q.   If, Ms. Olmos, there comes a time that you have trouble coming up with a word in English and you want to take a break or you want to ask your lawyer how you say this, we can do that.

A.   Okay.

Q.   I don't think that will happen, because I know your English is quite good, but, you know, from time to time, you know, there may be a word, you know, that you know how to say it in Spanish and you don't know how to say it in English.  We can take a break, and your

1    lawyer will give you the proper word.  All right?

2         A.   Okay.

3         Q.   So you were driving, and where were you

4    driving?

5         A.   Again?

6         Q.   When you had -- when this tank, I guess you

7    said, burped?  Is that what you said?

8         A.   The undertank from the store.

9         Q.   The undertank from the store?

10        A.   Uh-huh.

11        Q.   When you say, "From the store," this was where

12   you were delivering?

13        A.   Delivering.

14        Q.   So it wasn't actually the truck itself?

15        A.   No, no.  The truck didn't have nothing.  It was

16   the store tank.

17        Q.   The store tank.  Where was this store?

18        A.   Where was it?  In San Benito.

19        Q.   In San Benito?

20        A.   It was store No. 15, Tex Mart.

21        Q.   It was Tex Mart?

22        A.   Yes, sir.

23        Q.   And the undertank burped.  What does that mean?

24        A.   Okay.  When you're unloading, right, you put

25   both hoses, if you're unloading, all of a sudden, you

Q. You don't have a problem with the workers' compensation insurance company right now?

A. No, sir.

Q. Were you aware that Coastal had a policy that it allowed employees to have 13 weeks of leave?

A. Yes.

Q. After you had been on leave for 13 weeks, were you able at that time to return to work at Coastal Transport?

A. No, sir. Can I say something about that? Okay. I was aware, but also I was aware if you get an application, you were going to be the first to be hired, and they never gave me the application, and I asked for one, because they said because they had replaced somebody else in my position.

Q. We'll talk about that in a moment.

MR. BACON: Mark this as Exhibit 1.

Q. I'm going to hand you what has been marked as Exhibit No. 1. Have you ever seen this letter?

A. Yes, sir.

Q. You want to take a moment and look at it?

A. Uh-huh.

Q. Now, this is a letter that was mailed to you?

A. Right.

Q. One of the things that is talked about in this

difficult when you don't have the papers, and that's

why I'm showing you these.

          MR. BACON:  Mark this as Exhibit 2.

     Q.  Let me hand you what's been marked Exhibit 2.

     A.  Okay.

     Q.  Take a moment and look at it.

     A.  Oh, okay.  It was in October, but I just can't

remember the exact day.

     Q.  This date -- one of the things it says here is

that they -- this is from the unemployment benefits.

     A.  Right.

     Q.  And they said they would not pay you benefits

in October because you still were not able to work at

that time.

     A.  Uh-huh, but it was on October 6th.

     Q.  You think it was October 6th?

     A.  Uh-huh.

     Q.  You think you have some paper that says that it

was October 6th that your doctor released you?

     A.  Yes, I have a copy.

     Q.  All right.  Have you provided to your lawyer

all papers that you might have that are relevant to

this lawsuit?

     A.  If I have provided?

     Q.  I know you provided some documents to your

09:43:17 1    A.  Dispatcher.

09:43:18 2    Q.  Who is the person at Coastal Transport, as far

09:43:20 3  as you know, who does the hiring?

09:43:24 4    A.  Mr. Garza.

09:43:25 5    Q.  Mr. Garza, that's Manuel Garza?

09:43:28 6    A.  Right.

09:43:28 7    Q.  Have you had any discussions with Manuel Garza

09:43:33 8  since -- just a second -- since you left Coastal

09:43:38 9  Transport regarding going back to work there?

09:43:41 10    A.  No, sir.

09:43:42 11    Q.  All right.  Have you had any discussions with

09:43:51 12  Ms. Carlin, who is the human resources person in

09:43:54 13  San Antonio, regarding about going back to work at

09:43:57 14  Coastal?

09:43:58 15    A.  I called her one time asking her if they were

09:44:01 16  hiring.  She said that she didn't know because her

09:44:03 17  department was not down in Harlingen.

09:44:07 18    Q.  Did Ms. Carlin tell you that you needed to fill

09:44:09 19  out an application at the Harlingen terminal?

09:44:12 20    A.  Yes, she did.

09:44:13 21    Q.  Did you fill out an application at the

09:44:15 22  Harlingen terminal?

09:44:16 23    A.  No, because they didn't give me one.

09:44:36 24    Q.  Okay.  Did you ask Mr. Garza for an

09:44:42 25  application?

A. No, because I never spoke to him.  He was never there.

Q. All right.  You said you'd spoken to some people there?

A. Uh-huh.

Q. Is that correct?

A. Yes, sir.

Q. Let's talk about in-person contacts first.  You said you had spoken to Epi in person?

A. Uh-huh, yes.

Q. Did you go to the terminal and talk to Epi in person?

A. Yes, I did.  He said I needed to talk to Garza. He said to call later.

Q. Let's just do one step at a time.

A. Okay.

Q. You went to Epi, and you said -- and he told you you needed to talk to Garza?

A. Uh-huh.

Q. Answer the question verbally.

A. Yes, sir.

Q. Did you try calling Garza?

A. Yes, sir.

Q. Did you call him by telephone?

A. Yes, sir.

1    A.  Yes, sir.

2    Q.  It is my understanding that your complaint

3  about Manuel Loya is Manuel Loya sexually harassed you?

4    A.  Yes, sir.

5    Q.  My understanding about your complaint about

6  Manuel Garza is that he discriminated against you

7  because you were a woman, but he didn't sexually

8  harass.  It was just he treated you differently because

9  you were a woman.

10    A.  Yes, sir.

11    Q.  Is that correct?

12    A.  Yes, sir.

13    Q.  You're not alleging that Manuel Garza sexually

14  harassed you?

15    A.  Oh, no.

16    Q.  And just so we can make sure we get all the

17  complaints on the table, is there anybody else at

18  Coastal besides Manuel Loya or Manuel Garza that you

19  are complaining about?

20    A.  No, sir.

21    Q.  Okay.  It is also my understanding -- and, you

22  know, one of the purposes of taking your deposition is

23  so we can all have a clear idea as to what your

24  specific allegations are.

25         I think I have a pretty good idea, but I

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

A. Yes, but he didn't stop. I needed the job. I wanted to be a tanker driver. I had to stick with it and stay with my job.

Q. Okay.

A. Because I had to fight for my job so hard.

Q. Was there any change in Manuel Loya's behavior?

A. Any change, no.

Q. Do you remember -- you spoke with Tammy Carlin a couple of times about your problems with Manuel Garza and Manuel Loya.

A. Right.

Q. You had one conversation -- actually, let's move back. Let's talk about the problems that you had with Manuel Loya. When did they start?

A. When Linda came along. He started because Linda was dating Mr. Torres -- Robert Torres, and he wanted for me to be like Linda and Robert. He wanted to have a lover there at Coastal.

Q. Let me ask you this: Was Linda working at Coastal when you got there?

A. No.

Q. Okay.

A. I was the first one.

Q. So you were the first -- you were there first?

A. Yes.

Q. And you were hired in September 1996?

A. Uh-huh, right.

Q. When did Linda come along approximately?

A. About -- I'd say -- I'm not too sure, but it was five or six months later, more likely.

Q. Five or six months later, Linda came along. By the way, when you got your job at Coastal, how did you get the job at Coastal?

A. I saw it in a newspaper ad.

Q. Okay. And who did you apply to?

A. Who did I speak to?

Q. Yeah.

A. Mr. Garza.

Q. You filled out an application?

A. Yes, sir.

Q. Did he interview you?

A. Yes, sir.

Q. And he hired you?

A. Yes, sir.

Q. When you started out at Coastal, did you have any problems with Mr. Garza?

A. Oh, no.

Q. Okay. And at first, you didn't have problems with Mr. Loya?

A. No.

Q. Okay. But you're saying about five or six months after you came to work there, Linda --

A Came along.

Q. Okay.

A. We're different. We're so different, me and her. I never play around, especially with men, because men have other -- they think if you joke around, you give them whatever. And she was real friendly. And then it's when Mr. Loya started with me. I said, "No. Stop it."

Q. Okay. But you're saying Mr. Loya started whatever --

A. Bothering me.

Q. -- bothering you after Linda came, and you believe it was because Linda was carrying on with one of the drivers?

A. Because he was jealous about Robert, and he wanted to be the same.

Q. Okay. What was going on between Robert and Linda?

A. They were lovers.

Q. They were lovers. Was Robert Torres married?

A. Yes, he's married.

Q. But he was not married to Linda?

A. No.

Q. But you know for a fact they were actually carrying on a relationship?

A. Yes, sir.

Q. Was it a consensual relationship? That means Linda was agreeable to this relationship.

A. Both were agreed? Yes, both were agreed.

Q. I mean, it wasn't -- Mr. Torres wasn't sexually harassing Linda?

A. Oh, no.

Q. She --

A. They both pleased each other.

Q. But they were carrying on, and all the drivers could see this?

A. Yes, we all knew.

Q. And what did -- what did that have to do with you and Loya? What happened?

A. Because Loya was jealous about Robert Torres. That's what I would see.

Q. What did you see from Loya?

A. Started bugging me.

Q. How did he start bugging you?

A. Poking my ribs, because I was a little bit more skinnier, or he would hug me, or if I was sitting down like this, he would come into my seat. He would never leave me alone.

10:16:53 1    you when he poked you?

10:06:14 2        A.   In the drivers' room.

11:06:51 3        Q.   So he would come into the drivers' room and

10:06:57 4    poke you?

10:06:56 5        A.   Right.

11:06:59 6        Q.   And he would also -- and how often did he poke

10:07:00 7    you?

10:07:01 8        A.   So many times.  Even the drivers there would

10:07:04 9    tell him, "She's not going to listen to you.  Leave her

10:07:06 10   alone."

10:07:07 11       Q.   And what would he do?  Would he say something

10:07:11 12   when he poked you?

10:07:12 13       A.   "Aha," laughing.

10:07:12 14       Q.   He would poke you and say, "Aha," and laughed?

10:07:15 15       A.   Laughing, "Oh, I'm only just playing."

10:07:15 16       Q.   Did you tell him, "Leave me alone"?

11:07:21 17       A.   Yeah, so many times.

10:07:22 18       Q.   And he just kept on doing it?

10:07:24 19       A.   Uh-huh.

10:07:24 20       Q.   That did not stop?

10:07:34 21       A.   No.

10:07:34 22       Q.   You did not complain about that at that time?

10:07:34 23       A.   No, because I had to do -- the thing is, if I

10:07:35 24   would complain, he would get me, like, not giving me my

10:07:36 25   stuff to work.

1    He would -- if I would go and ask him for
2 my stuff to work, my equipment, he would say, "I don't
3 know nothing.  Go tell Garza."  And that was their
4 excuses.  So I had to let myself poke me, because if I
5 wouldn't do that, I wouldn't get my equipment.
6    Q.  Okay.  And poking, he would take his finger and
7 just poke you in your ribs?
8    A.  Like this, uh-huh.
9    Q.  What else did Loya do during this time period?
10    A.  Okay.  He would start saying that -- he would
11 talk -- start telling Garza that he needed for someone
12 to help him on the paperwork, okay, especially on
13 Sundays.  Nobody was there, only himself as a
14 dispatcher, right, and that's when he forced me a kiss.
15    I didn't want to make a scandal because I
16 needed my job.  I wanted to be a tanker driver, like I
17 was saying before.  It would bother me a lot.
18    Q.  So you were working on a Sunday?
19    A.  Yes.  Especially on Sundays, he would tell
20 Garza that he wanted me there so I can help him on the
21 paperwork.  There was a long big tablet, which, you
22 know, that the loads, you put them down, you write them
23 down.
24    And he would be there constantly and
25 telling me, "No.  You need to be here because you need

10:08:52 1    to help me." And anyway, I wouldn't get paid the four

10:08:53 2    hours. Sometimes I would get paid, sometimes I won't,

10:08:59 3    and I would be there.

10:09:00 4      Q. Tell me what did he do to you?

10:09:02 5      A. Okay. I was like this sitting down, right, and

10:09:05 6    then he came, and I turned like this, and is when he

10:09:08 7    kissed me. He put his head here.

10:09:10 8      Q. Okay. He put his head on your shoulder?

10:09:13 9      A. Uh-huh, and I took off.

10:09:16 10      Q. To cough?

10:09:17 11      A. Took off.

10:09:17 12      Q. Where did he kiss you?

10:09:19 13      A. On my mouth.

10:09:20 14      Q. He kissed you on your mouth, and then he took

10:09:21 15    off?

10:09:21 16      A. No. I took off.

10:09:22 17      Q. You took off?

10:09:23 18      A. Uh-huh.

10:09:24 19      Q. Where did you go?

10:09:25 20      A. To my house.

10:09:25 21      Q. So you left for the day?

10:09:27 22      A. Yes.

10:09:27 23      Q. Did you at that time complain about that?

10:09:30 24      A. Uh-huh.

10:09:31 25      Q. Who did you complain to?

BRYANT & STINGLEY, INC.
McAllen     Harlingen     Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

10:09:3□ 1    A.  It's when I complained -- when Linda complained

10:09:3□ 2  and I complained when the safety guy went to Coastal.

10:09:3□ 3  We had a meeting, and they were not listening to Linda,

10:09:4□ 4  is when I stood up, and I told him that Linda was right

10:09:44 5  that there at the company they were having sexual

10:09:47 6  harassment.  It's when you guys came along.

10:09:5□ 7    Q.  Listen to my question.

10:09:52 8    A.  Uh-huh.

10:09:52 9    Q.  The day he kissed you, you remember when that

10:09:56 10  happened?

10:09:58 11    A.  Yes, it was on a Sunday.  I can remember that

10:09:59 12  day.

10:10:01 13    Q.  It was a Sunday.  How long had you been working

10:10:02 14  there?

10:10:04 15    A.  I'd been working there for four years exactly.

10:10:□6 16    Q.  You'd already been there for four years?

10:10:□□ 17    A.  No, no.  How long I was there?

10:10:11 18    Q.  This is early on.

10:10:14 19    A.  Yes.  About seven months, eight months.  It was

10:10:17 20  when Linda came along.

10:10:20 21    Q.  So it was around six, seven, eight months you'd

10:10:22 22  been there.  You were working with him on a Sunday.  He

10:10:24 23  comes up, kisses you, and you get up and leave?

10:10:2□ 24    A.  Uh-huh, right.

10:10:29 25    Q.  Was that the only time he kissed you?

1    Mr. Bacon's question.  Just answer his question.

2                    THE WITNESS:  Okay.

3        Q.  I'm going to ask you about all these details,

4    but what I'm trying to do now is figure out the time.

5        A.  Uh-huh.

6        Q.  And I do know that you did complain at some

7    point in time.  We're going to talk about that.  But,

8    you know, that investigation took place a year later or

9    1997, and so I'm trying to figure out the day that you

10   got kissed, did you complain that day to anybody?  The

11   day you went home, did you complain to anybody at

12   Coastal?

13       A.  No, because he started saying he was sorry.

14       Q.  Okay.  When did he say he was sorry?  The next

15   morning?

16       A.  No, no, no.  That day.

17       Q.  Okay.  Did he call you at home and said he was

18   sorry?

19       A.  No.  He told me he was sorry, and I just got my

20   keys and took off.

21       Q.  So he kissed you.  He saw that you were upset.

22   He said, "I'm sorry"; is that right?

23       A.  Right.

24       Q.  And you took --

25       A.  I went --

A.  Right.

10:13:31 2    Q.  Okay.  And some time did pass, I mean, because

10:13:36 3  you did not have that safety meeting and that

10:13:39 4  investigation didn't take place right away?

10:13:41 5    A.  No.

10:13:41 6    Q.  It took place maybe four or five months later;

7  is that correct?

10:13:46 8    A.  Yes.

10:13:47 9    Q.  At least that much?

10:13:47 10    A.  Uh-huh.

10:13:48 11    Q.  All right.  In that four- or five-month period

10:13:51 12  before you had that safety meeting, did you ever

10:13:54 13  complain to anybody in Coastal's management about Loya?

10:13:59 14    A.  No, sir.

10:14:01 15    Q.  Okay.  Did Loya -- did you ever work with Loya

10:14:03 16  again on a Sunday?

10:14:04 17    A.  Yes.

10:14:05 18    Q.  Okay.  Did he ask you to work on a Sunday with

10:14:07 19  him?

10:14:08 20    A.  Yes.

10:14:09 21    Q.  Did anything happen on any other Sundays that

10:14:11 22  you worked with Loya?

10:14:12 23    A.  Yes.  Poking me.

10:14:13 24    Q.  What happened?

10:14:14 25    A.  Poking me.

A.  Every time when he has a chance, he would see me and I would be by myself.

Q.  And that's another thing I want to emphasize. Whenever -- when he kissed you, no one was present?

A.  No, sir.

Q.  When he would try to hug you behind the truck while you were doing your final check --

A.  Post-trip.

Q.  -- post-trip, no one -- he wouldn't do this in front of other people?

A.  No.

Q.  He didn't do it in front of Garza?

A.  No, but in front of the drivers, yes.

Q.  He would hug you in front of the other drivers?

A.  Yes.

Q.  But he never did it in front of Garza?

A.  No.  He would tell the drivers that he was playing.

Q.  And he would tell the other drivers he was playing.  So in front of Garza, he was careful as to what he did?

A.  Oh, very careful.

Q.  And you didn't complain to Garza about what Loya was doing to you when he wasn't around?

A.  No, because then I would get punished for

1  because I was late.

2  Q.  Was this the first time that he asked you to go

3  out with him?

4  A.  No.  He asked me several times even through the

5  phone.

6  Q.  And again, this is -- we're talking about the

7  before period?

8  A.  Before, yes, before period.

9  Q.  When you say "through the phone," how did that

10  occur?  Did he call you at home?

11  A.  At home and told me for me to go out.  It was

12  my day off.  He was going to pick me up.  I said no.

13  Then he said, "Come on.  Give me an opportunity."  And

14  then he told me, "Chaparra, why not?"  I told him no.

15  Q.  That means little woman, right?

16  A.  "Little woman, why not?  Let's go out."

17  And I would tell him, "You're a married

18  man.  What can you offer me?  I don't want to have

19  problems with you."

20  Q.  So you never agreed to go out with him?

21  A.  Never.

22  Q.  And you never went out with him?

23  A.  Never.

24  Q.  But he would continue to ask you to go out with

25  him?

A. To go out. That day, I came at 7:00, bring my truck in, he scared me because nobody was there. Everything was locked. The office was locked, everything.

Q. Let me summarize. And again, we're talking about the before period. On one incident, he kissed you. On another -- on many incidents, he poked you, and that he did in front of other people but not in front of Garza?

A. No. He would respect Garza a lot.

Q. He respected Garza, and he was afraid that Garza wouldn't approve of it?

A. Right.

Q. He grabbed you from behind on a number of occasions while you were by your truck?

A. Uh-huh.

Q. He called you up and at home and asked to go out with you?

A. Right.

Q. He did that on more than one occasion?

A. One more occasion.

Q. On two occasions?

A. No, no.

Q. Many occasions?

A. Many occasions.

11:03:18 1    A.  No, sir.

11:03:21 2    Q.  If I were to tell you it was in August of 1997,

11:03:23 3  you don't know if it was August 1997?

11:03:25 4    A.  No, sir.

11:03:26 5    Q.  Would it seem based on sort of the time period

11:03:29 6  you had been there and would that seem approximately

11:03:32 7  the time it would have been?

11:03:39 8    A.  Can't remember.

11:03:40 9    Q.  One of the things that might help you and one

11:03:42 10 of the reasons I brought these records, your attendance

11:03:47 11 records show that in 1997 you were out for your

11:03:50 12 gallbladder operation.

11:03:52 13           Was this shortly after you returned from

11:03:54 14 your gallbladder operation a couple months after that?

11:04:00 15   A.  I don't remember, sir.

11:04:02 16   Q.  Okay.

11:04:02 17   A.  I don't remember.

11:04:02 18   Q.  You really don't know?

11:04:04 19   A.  No, I don't remember.

11:04:06 20   Q.  But if there were other records that showed

11:04:10 21 that Tammy Carlin was there with Tony Culpepper in

11:04:13 22 August of 1997, you would not dispute that?  You have

11:04:17 23 no reason to dispute that?  You know what the word

11:04:20 24 "dispute" means?

11:04:22 25   A.  Yeah.

11:04:22 1    Q.  Not right?

11:04:24 2    A.  Right.

11:04:24 3    Q.  You have no reason --

11:04:26 4    A.  No, no.  The thing is, I don't remember, but I

11:04:29 5    know you guys came.

11:04:29 6    Q.  All right.  And it was shortly after that

11:04:30 7    safety meeting?

11:04:31 8    A.  Uh-huh, yes.

11:04:32 9    Q.  Let me say, I think there are records that will

11:04:34 10   show when these meetings took place, but I just want to

11:04:36 11   make sure that you don't have any reason to think that

11:04:38 12   it was --

11:04:39 13   A.  No, no.  I just don't remember the period.

11:04:43 14   Q.  Okay.  Now, you remember meeting with Tammy

11:04:48 15   Carlin and Tony Culpepper and the company's lawyer?

11:04:52 16   A.  Yes, sir.

11:04:53 17   Q.  And you were asked about Linda Garcia's

11:04:59 18   allegations of sexual harassment?

11:05:02 19   A.  Yes, sir.

11:05:03 20   Q.  Do you remember that there was -- a lot of

11:05:05 21   employees were spoken to at the time?

11:05:06 22   A.  Uh-huh.

11:05:06 23   Q.  Do you remember that?

11:05:07 24   A.  Yes, sir.

11:05:08 25   Q.  You remember that maybe almost every employee

1   there was called in and talked to?

2       A.  Yes, sir.

3       Q.  And you were asked about Linda Garcia's

4   allegation of sexual harassment.

5       A.  Yes, sir.

6       Q.  You told Ms. Carlin that as far as Linda's

7   complaints were, you really had no knowledge.

8       A.  Uh-huh.

9       Q.  Is that correct?

10      A.  Yes, sir.

11      Q.  You did not know if Linda had been sexually

12  harassed or not sexually harassed.

13      A.  No, sir.

14      Q.  Is that correct?

15      A.  Yes, sir.

16      Q.  But you also told Linda that you had some -- I

17  mean, not Linda.  You told Ms. Carlin that you also --

18  you had had some problems.

19      A.  Yes, sir.

20      Q.  And that was the first time that you had

21  complained to anybody at Coastal about Manuel Loya; is

22  that correct?

23      A.  Yes, sir.

24      Q.  And you did complain about Manuel Loya.

25      A.  Yes, sir.

Q. Is that right?

A. Yes, sir.

Q. You did not at the time -- although you complained about Manuel Loya, you did not tell Ms. Carlin that Manuel Loya had tried to kiss you?

A. No, because I didn't want no problems. I needed my job.

Q. You did tell Ms. Carlin that Manuel Loya had been bothering you about going out with him?

A. Yes, sir.

Q. And that you were very uncomfortable working side by side with Manuel Loya?

A. That's true, yes, sir.

Q. You didn't tell Ms. Carlin that Manuel Loya had poked you physically but just that he was --

A. Bothering me.

Q. -- bothering you?

A. Uh-huh.

Q. Is that correct?

A. Yes, sir.

Q. Ms. Carlin told you that even if he was just asking you out for a date, the fact that he was bothering you, that was wrong. She told you that?

A. Right.

Q. She told you that they were going to talk to

Mr. Loya about that?

    A.  Right.

    Q.  She told you that if you had any problems with Mr. Loya to call her?

    A.  Right.

    Q.  And I realize that you were not present when Manuel Loya was spoken to.  I mean, they didn't talk to him in front of you.

    A.  I was not present, but later on -- nothing.

    Q.  You know Manuel Loya told you they had spoken to him.

    A.  Yeah.  He even showed me his write-up.

    Q.  So Manuel Loya came to you and showed you that he had been written up?

    A.  Yeah.  It was a long letter.

            MR. BACON:  Mark that as an exhibit.

    Q.  I'm going to hand you what has been marked Exhibit 9.  I'd like you to take a look at that.  Does that look like what he showed you?

    A.  No.

    Q.  He showed you something different?

    A.  Yes.  It was a long letter.

    Q.  From who?

    A.  I think it was from Mr. Garza.

    Q.  He got a long letter from Mr. Garza?

A.   I think so, but he showed me a write-up.  He said, "Look, the write-up they gave me because of you." It was longer than this.

Q.   Did you read the letter?

A.   No, sir.

Q.   Did he tell you that he had gotten a write-up because he had been bothering you?

A.   Yes, sir.

Q.   Did he tell you that he had been warned that if he continued to bother you, he'd be fired?

A.   He told me, but he didn't listen.

Q.   Okay.  But I'm asking you, you know, or at least based on what he told you that Coastal had told him that if he continued to bother you, he would be fired?

A.   But he still bothered me.

Q.   And we're going to talk about that.  How did Mr. Loya continue to bother you after Coastal sat down with him and told him he would be fired if he continued to bother you?

A.   I have an explanation.  My loads went down, right?  My loads went down, and he told me if I wanted loads, I'd have to give in.  He didn't care.

Q.   Okay.  Your loads started to go down.  Did they start to go down immediately after this?

write-up.

And then my loads went down, and he would tell me, "I don't know nothing. There's no loads. You need to tell Garza. You need tell Garza." That's when I went to tell Garza. I said, "Look, maybe because I spoke out and he doesn't want to give me loads."

Q. Okay. In this period before -- your loads started going down and you go complain to Garza, up until that time --

A. Garza helped me. He went and talked to him.

Q. Here's what I want to explore. The time period from the time that he is reprimanded and the time you go to Garza and say, "I'm not getting good loads, and I think it may be because I complained about him," okay, in that time frame, I want to know what Loya was doing other than not giving you loads during that time period.

A. Not giving me loads.

Q. He didn't -- in that time period he was not poking you?

A. No.

Q. He was not kissing you?

A. No.

Q. He was not asking you to go out?

A. No.

A. Right.  He went to speak to him.

Q. And do you know if Garza spoke to him?

A. He did.

Q. How do you know Garza spoke to him?

A. We were -- because I did -- I did trust Garza.
I did -- I know he did.

Q. Okay.

A. By his -- the way he is.

Q. Okay.  And the loads actually started to pick
up after that?

A. Yes.

Q. So you figured Garza had spoken to him?

A. Uh-huh.

Q. Now, how much time passes -- I mean, when does
Loya start doing things to you again that you
considered sexual harassment?

A. Okay.  Let's say three months later or four
months.  I don't really remember, but he did.

Q. So maybe three months later --

A. He started playing with poking again.

Q. He started poking again?

A. Poking, and, "Oh, you're gaining too much
weight," or "Comb yourself," or do this or do that,
because I'm always being very sloppy.

Q. Okay.  So he started poking you.  Did he poke

11:16:07  1    you as much as he did before or a little bit less?

11:16:10  2        A.   More.

11:16:11  3        Q.   He started poking you more than he had before?

11:16:13  4        A.   Uh-huh.

11:16:14  5        Q.   And he started saying you're gaining weight?

11:16:16  6        A.   (Witness nodded)

11:16:17  7        Q.   He didn't ask you to go out on a date?

11:16:19  8        A.   No.

11:16:20  9        Q.   He never again asked you to go out on a date?

11:16:23 10        A.   No, but one time he called me.  He freaked me

11:16:27 11    out.  He freaked he out saying me and him, it was over.

11:16:32 12    I said, "Man, I've never been with you.  I never went

11:16:38 13    out with you or nothing."

11:16:40 14        Q.   He never asked you again out on a date from the

11:16:43 15    time he was reprimanded, but at one point in time, he

11:16:46 16    called you at home; is that right?

11:16:47 17        A.   Yes.

11:16:48 18        Q.   And he said, "You and me are over.  We're not

11:16:50 19    going out anymore"?

11:16:51 20        A.   He freaked me out.  That's when I called Garza

11:16:53 21    and said, "Well, what's his problem," if he was

11:16:55 22    mentally something or something.

11:16:58 23        Q.   You remember --

11:16:59 24        A.   Again, Garza spoke to him, because he called me

11:17:02 25    home and told me everything was over.  I freaked out.

BRYANT & STINGLEY, INC.
McAllen         Harlingen        Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

A. He tried to kiss me. But he did kiss me because he put his mouth on my lips, so that's a kiss.

Q. He kissed you in the restroom?

A. Uh-huh.

Q. Do you remember -- now, we know it's in the period after. Do you know approximately when in that period?

A. Before my last accident.

Q. Before your last accident. So you're still at Coastal, but it could be anywhere in that time period; is that correct?

A. Right.

Q. No one saw this?

A. No, sir. I noticed one thing. He would tell, like, Miguel, the one that changes the tires, because he would always look at me very suspicious, but I'm not sure.

Q. But you think he may have told Miguel?

A. Uh-huh.

Q. But you don't know for sure?

A. No.

Q. What else -- you said he kissed you on many occasions?

A. Right.

Q. Give me one other occasion that he kissed you.

| | |
|---|---|
| 11:23:09 1 | A. In the drivers' room is when I pushed him. |
| 11:23:11 2 | Q. But that was before? |
| 11:23:14 3 | A. No. |
| 11:23:16 4 | Q. He kissed you again in the drivers' room? |
| 11:23:17 5 | A. Uh-huh. |
| 11:23:17 6 | Q. When did this happen? |
| 11:23:19 7 | A. Before the last accident. |
| 11:23:20 8 | Q. Okay. On one occasion he kissed you in the |
| 11:23:23 9 | drivers' room? |
| 11:23:24 10 | A. Uh-huh. |
| 11:23:25 11 | Q. Was there anybody present? |
| 11:23:26 12 | A. No. |
| 11:23:27 13 | Q. How did he kiss you? |
| 11:23:29 14 | A. How? When you kiss somebody on the mouth. |
| 11:23:31 15 | Q. Did he come up to you in the front? Did he |
| 11:23:31 16 | come up behind? |
| 11:23:31 17 | A. In the front. |
| 11:23:32 18 | Q. He just came up to you and kissed you on the |
| 11:23:34 19 | mouth? |
| 11:23:35 20 | A. Uh-huh. |
| 11:23:35 21 | Q. What did you do about it? |
| 11:23:37 22 | A. Well, sometimes I had to let myself, because |
| 11:23:39 23 | then I was afraid for him to do things to me. He |
| 11:23:42 24 | would. If I wouldn't, he would start doing things to |
| 11:23:44 25 | me, and it was all the pressure that I had. |

118

| | |
|---|---|
| 11:23:46 | 1 |

Q. Any other time --

A. And that was every single day I had problems. If in the morning, I wouldn't have my equipment in the truck, starting with hoses, Buck Rogers, fittings, and I had to go and get the equipment from other trucks. You know when I would get from my first load, Garza would start yelling, and that was every single day.

Q. So are you saying every single day he kissed you?

A. No, no. About my equipment.

Q. I'm trying to figure out -- you say he kissed you lots of times.

A. Uh-huh.

Q. I know he kissed you once or you said he kissed you once before he was reprimanded.

A. Uh-huh.

Q. And after he was reprimanded, he kissed you apparently once in the restroom.

A. Uh-huh.

Q. He kissed you once in the drivers' room?

A. Uh-huh.

Q. What other times did he kiss you?

A. I don't remember, sir. It's been many occasions.

Q. Okay. Let's talk about how many.

A.   You're telling me to figure out how many times, right?  But I cannot tell you how many times, because most of the time when he would see me he would bother me, so I don't have them in count.

Q.   When you say he would bother you, he would bother you by poking you?

A.   Poking me, or if I would be sitting down, he would -- let me give you -- I'll be here sitting down. He would go like this and sit in back of me, and I would have to stand up.  Bother me in so many ways.  It was a lot of pressure.

Q.   When you say he would hover over you --

A.   But in the back of the seat with his two feet. I had to stand up, and the thing was this, I always had in my head I wanted to be driver -- tanker driver, but I had to go through all this.

Q.   Tammy Carlin, when she met with you, told you that it was against Coastal's policy to let people sexually harass one another, didn't she?

A.   Yes, she did.

Q.   She told you it was not permissible for Loya to ask you out on dates.

A.   Uh-huh.

Q.   Is that correct?

A.   Yes.

Q. I mean, because you complained that he kept on asking you out.

A. Uh-huh.

Q. You didn't tell her that he tried to kiss you, but you did tell her that he kept on bothering you for a date, correct?

A. Uh-huh.

Q. You need to answer that verbally.

A. Yes, sir.

Q. And she said that's not allowed?

A. Yes, sir.

Q. Did you understand that kissing was probably not allowed under the sexual harassment policy?

A. Yes, sir.

Q. You did not call Tammy Carlin -- she told you to call her if you had any more problems.

A. I used to -- I called her several times, but complaining about my equipment, because I didn't know when to tell her about sexual harassment, because if that was going to cause my termination of my job of which I lost it.

Q. You did call Tammy Carlin on numerous occasions to complain about problems with your equipment?

A. Uh-huh, right, yes, sir.

Q. But in all those conversations that you had

with Tammy Carlin, you never told her that Loya was

still sexually harassing you?

    A.  No.  Because I knew something was going to

happen to me.  I was afraid.

    Q.  What were you afraid of?

    A.  Okay.  I was afraid, those connections, they

would do something to my truck, have an accident, like

the accident I almost had on F Street that I told him

about a month to fix the brakes.

        And you know what happened?  My whole

tanker loaded with jet fuel and myself, I didn't have

brakes to brake, and I almost ran into about 20 cars,

but what I did, I had to go through the grass and pass

all those cars and go back to the expressway, and only

because I was a good driver to hold myself and go back,

and they would just do a lot of stuff to me.

    Q.  Okay.  But apparently, you can't count the

number of times, but it was many times that Loya kissed

you even after he was reprimanded.

    A.  Right.

    Q.  Is that correct?

    A.  Yes, sir.

    Q.  And the ones that you remember are the restroom

and the one in the drivers' room?

    A.  Yes, sir.

BRYANT & STINGLEY, INC.
McAllen         Harlingen        Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

11:30:14 1      Q.   Which one is talking about Loya?

11:30:25 2      A.   Loya, this one, Exhibit No. 5.

11:30:25 3      Q.   Okay.  Let's talk about Exhibit No. 5.  I want

11:30:23 4   to talk about -- what incidents are described in here?

11:30:31 5   I mean, if you look on the second page, you describe

11:30:39 6   that he started to bother you after you had your

11:30:42 7   accident on May 6th, and he says, "Are you staying over

11:30:45 8   for a barbecue?"

11:30:47 9      A.   Okay.  Yes.  When he was bothering me, one

11:30:54 10  afternoon, I got to the yard and -- I have it over

11:31:05 11  here.  One afternoon I got there from work, and I was

11:31:12 12  doing my logbook and everything.  He made a barbecue

11:31:15 13  with Linda, with Robert, with all the drivers.

11:31:19 14          He was speaking about me.  He wanted to

11:31:21 15  show off with me with the other drivers there, and then

11:31:27 16  he said, "You leaving already?"

11:31:29 17          I said, "Yeah, I'm leaving."

11:31:30 18          "You're not staying for the barbecue?  The

11:31:31 19  barbecue is for you."

11:31:32 20          I said, "I didn't tell you for you to make

11:31:33 21  me a barbecue, and I don't want for you to show off

11:31:37 22  with me," so I took off.

11:31:38 23     Q.   One of the things it says here, it says it was

11:31:43 24  in the spring of 1997.

11:31:43 25     A.   Yes, more likely.

Q. So that was before he was reprimanded, before the investigation?

A. Yes, something like that. The dates, I'm not too sure, but that incident happened, and my witnesses, they're there, sir.

Q. No. 3, paragraph 3, you say that Mr. Loya showed up on one Sunday drunk.

A. Uh-huh. You see, there's the tank that I just told you a little while ago. It was in the afternoon at 7:30 p.m.

Q. And then he says -- you asked him what he was doing here, and he said, "We're going to go out."

A. No. To go out.

Q. To go out?

A. To go out. He was inviting me to go out.

Q. Now, this was again before the investigation?

A. I'm not too sure.

Q. I thought your testimony was he never asked you again to go out.

A. No. It was before.

Q. It was before?

A. Uh-huh.

Q. Okay. There's paragraph 4, you describe an incident where Loya came up to you -- and I'm going to translate this in English, and you tell me if the

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

translation is correct.  "Hey, shorty."

A.  Chaparra.

Q.  "Chaparra, I would like to go out with you,"
or, "I'd like to be with you like Linda and Robert."

A.  Uh-huh.

Q.  And your response to him is, "You're crazy,"
and you left the room; is that correct?

A.  Uh-huh.

Q.  This was also an incident that occurred
before --

A.  Before.

Q.  -- the investigation?

A.  Right, before the investigation.

Q.  Okay.  Let's look at paragraph 5.  In paragraph
5 you talk about on Sunday there was no dispatcher, so
Loya would be the dispatcher.

"He would try to flatter me by saying
'Choose the load you want,' and showed me the load
slips, and I told him, 'Just give me any load.  I came
to work, not to choose my load.'  And every time he was
on duty as dispatcher, he would tell me to call him on
the phone for more instructions.

"On the phone he would start to give me
the instructions.  While looking over the load slips,
he would say -- he would make conversation, you know,

11:33:52  1    'Mamacita'" -- which I guess is for, you know -- it's a

11:33:54  2    little bit like, you know, gal -- "'when am I going to

11:33:59  3    come pick you up?'"  Is that what the translation is

11:34:01  4    basically?

11:34:02  5        A.  Yes, sir.

11:34:02  6        Q.  "And I told him, 'Just give me the load.  Don't

11:34:06  7    let me choose, and stop wasting my time.'  And he would

11:34:10  8    say, 'Don't get mad,' and he said, 'Don't tell anybody

11:34:13  9    about this.'"

11:34:14 10        A.  Uh-huh.

11:34:15 11        Q.  Okay.  So here again, he's trying to ask you

11:34:17 12    out for a date?

11:34:18 13        A.  That's true.

11:34:19 14        Q.  Was this before or after the investigation?

11:34:21 15        A.  Before.

11:34:23 16        Q.  Okay.  No. 6, it says, "Mr. Loya made the

11:34:26 17    schedule for the drivers, and he managed to assign me

11:34:29 18    to work alone with him on Sundays.  There was some

11:34:32 19    Sundays Mr. Loya would claim there was no loads.  He

11:34:35 20    went on to persuade me to help him with his paperwork.

11:34:39 21    I told him it was not my job.  He then would say I was

11:34:43 22    still getting paid for waiting for the loads."

11:34:46 23        A.  That was before.

11:34:46 24        Q.  That was before.  Then No. 7, "On a Sunday,

11:34:50 25    Mr. Loya forced a kiss on me while I did his paperwork.

1  I quickly got up and left.  He started to apologize as

2  I left."

3      A.  Before.

4      Q.  That was before.  And that was the kiss you

5  talked about earlier today?

6      A.  Uh-huh.

7      Q.  Then No. 8, it says, "Three days later during

8  the week, he started to bother me more.  Several times

9  if I was sitting down, he would cross his leg over the

10  backside of the chair that I was sitting on and try to

11  fit himself between the chair and me.

12          "I would quickly get up, and I felt so

13  uncomfortable, and I'd just go to check my truck or

14  clean the windows or just be in my truck rather than

15  the drivers' room to avoid him.  In the next safety

16  meeting, I spoke up about it."  Now here he's bothering

17  you.  Is this before or is that after?

18      A.  This is -- this would be before and after.

19      Q.  Well, but it says the next safety meeting you

20  spoke up about it.

21      A.  Before.

22      Q.  So here you're talking about just the before.

23      A.  Before.

24      Q.  All right.  No. 9, it says, "If I was standing,

25  he would come from behind me and put his hands on my

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

waist or his hands over my shoulders, or he would poke me with his fingers on the sides of my abdomen. Humberto Muniz and Freddy Perez saw, and they defended me.

"Freddy told Mr. Loya, 'She's not going to pay attention to you, guy. Leave her alone.' And then Humberto also said, 'It's true. She's not going to pay attention to you.'"

A.  That was after.

Q.  How much after?

A.  How much after?  Let's say five months later.

Q.  This occurred -- No. 9 occurred about five months after he was reprimanded?

A.  Uh-huh.

Q.  All right.  And then you gave the addresses for Humberto and Freddy.  And then No. 10, "I felt afraid of his revenge and what he did to other drivers.  He would tell me, 'Don't come tomorrow.'  B.  He would give drivers low paying loads.  He would also tell them, 'Bring the barbecue.  It's your turn.'

"He made a collection of money from drivers in order to pay for his beer.  He wanted gifts from others in order to keep their jobs, and I wasn't going to give in."

Now, I'm going to ask you, is No. 10

11:37:07  1   related to -- I mean, I know they're complaints, but

11:37:11  2   are these sexual harassment complaints?

11:37:11  3       A.  Yes, sir.

11:37:12  4       Q.  How are these sexual harassment?

11:37:15  5       A.  How this was --

11:37:16  6       Q.  The things that are in No. 10, what does this

11:37:18  7   have to do with sexual harassment?

11:37:20  8       A.  Because I was afraid all the things he would do

11:37:22  9   to me.  I know he was going to do these things, and

11:37:28 10   that's why I had to be quiet.

11:37:30 11       Q.  So you complied with these things because you

11:37:33 12   were afraid of what he had done to you in the past?

11:37:35 13       A.  And he would do that, because I know that.

11:37:38 14       Q.  Let me ask you something.  This was prepared

11:37:43 15   after -- for the Texas Commission on Human Rights after

11:37:46 16   you were -- you left Coastal; is that correct?

11:37:48 17       A.  Yes.

11:37:48 18       Q.  So this was at the end of your employment?

11:37:51 19       A.  Uh-huh.

11:37:52 20       Q.  In this exhibit, why did you not mention the

11:37:56 21   restroom issue, the time when he pushed you in the

11:38:01 22   restroom?  Why was that not mentioned in this?

11:38:04 23       A.  Okay.  Because I forgot about it, but it's

11:38:06 24   there.  I'm not lying.

11:38:07 25       Q.  I'm not saying you are.  I'm just saying you

11:38:19  1    forgot to mention it?

11:38:11  2        A.  I forgot to mention it.

11:38:13  3        Q.  Why did you only mention one of the kiss

11:38:16  4    incidents, which is the one that occurred before he was

11:38:19  5    reprimanded?  You didn't mention any other kiss

11:38:22  6    incidents.

11:38:22  7        A.  Because the time I was employed, before, that's

11:38:27  8    why I just wrote it.

11:38:30  9        Q.  Okay.  Most of everything you've got here -- in

11:38:32 10    fact, we went through these.  These were all before

11:38:34 11    incidents.  What I mean before, they were incidents

11:38:37 12    that occurred before he was reprimanded.

11:38:41 13            Why didn't you include the incidents from

11:38:43 14    afterwards in this statement?

11:38:46 15        A.  Because I was not thinking before or after --

11:38:45 16        Q.  Okay.

11:38:49 17        A.  -- like you're doing it right now.  If I would

11:38:51 18    have knew, I would have wrote them.

11:38:54 19        Q.  So you weren't thinking at the time to include

11:38:57 20    the after, by that I mean the incidents that occurred

11:39:00 21    after he was reprimanded, when you were at the Texas

11:39:03 22    Commission of Human Rights?

11:39:04 23        A.  Uh-huh.

11:39:04 24        Q.  Let me ask you this:  Did you type this, or did

11:39:05 25    someone at the Texas Commission of Human Rights type

CutePDF - www.texisc.com

11:39:17  1   this for you?

11:39:08  2       A.   No.   I typed this.

11:39:10  3       Q.   Did you type this on a personal computer,

11:39:11  4   someone's computer?

11:39:12  5       A.   I typed it.

11:39:14  6       Q.   And then you took it to the Texas Commission of

11:39:15  7   Human Rights?

11:39:16  8       A.   Uh-huh, yes, sir.

11:39:17  9       Q.   And you did this because they asked you to do

11:39:20 10   this?

11:39:21 11       A.   Yes, sir.

11:39:21 12       Q.   All right.   Going back to the previous one, the

11:39:31 13   one that's Exhibit No. 4, this was the one you had done

11:39:41 14   earlier; is that correct?

11:39:42 15       A.   Yes, sir.

11:39:55 16       Q.   When you wrote this, did you try to write this

11:40:01 17   in order of the time that things occurred?

11:40:07 18       A.   Yes.

11:40:08 19       Q.   You started when you began working?

11:40:09 20       A.   No, no.   When I began working?

11:40:11 21       Q.   I mean, the first -- I don't mean that.   I

11:40:13 22   don't want to confuse you here.   For example, when you

11:40:15 23   started -- if you look at the first page of Exhibit 4,

11:40:19 24   the very first paragraph, you start talking about when

11:40:22 25   you started working there.

A.   Uh-huh.

Q.   Is that correct?

A.   Yes, sir, because you have to make it clear.

Q.   Okay.  And then you talked about Linda coming to work there?

A.   Uh-huh.

Q.   And you talked about Linda?

A.   Uh-huh.

Q.   If you look at the third page, and there's a paragraph that starts, "A week later," do you see that?

A.   Okay.

Q.   Why don't you read that paragraph to yourself, and I'm going to ask you some questions about it.  Now one of the things it talks about here is, it talks about the safety meeting.

        Are you talking about the safety meeting where they did the investigation that resulted -- when you say, "The people from San Antonio came and they questioned Linda and I," was that the meeting we talked about before?

A.   Yes, sir.

Q.   And then you jump down and you talk about the accident in May 1998.  I guess the question I have is, is it possible you're getting your time collapsed a little bit here?  You know what I mean?  If the

11:42:25 1    investigation was in August of 1997 --

11:42:29 2        A.   I jumped.

11:42:31 3        Q.   You jumped?

11:42:31 4        A.   Yes, I did.

11:42:32 5        Q.   That's fine.  I mean, it's hard to remember how

11:42:34 6    things occur and in what order.  One of the things I'm

11:42:38 7    curious about is, after the meeting, the paragraph that

11:42:41 8    you describe the meeting with the people from

11:42:44 9    San Antonio where they investigated Linda Garcia's

11:42:48 10   sexual harassments allegations -- in the rest of this

11:42:51 11   memorandum, in this letter that you wrote for the EEOC,

11:42:55 12   there's no description of Loya sexually harassing you.

11:42:59 13   I mean, you talk about Loya sexually harassing you in

11:43:02 14   the first couple of pages?

11:43:03 15       A.   I made another -- I made two.  You don't have

11:43:07 16   it?  There is.  Here it is.

11:43:16 17       Q.   Okay.  Where?  Why don't you tell me --

11:43:22 18       A.   No.  There is about Loya.

11:43:24 19       Q.   I think you talk about Loya.

11:43:34 20       A.   There is about Loya.

11:43:34 21       Q.   What I'm asking is about the sexual

11:43:34 22   harassment --

11:43:34 23       A.   Right here.

11:43:34 24       Q.   What page are you on?  And I know the pages

11:43:34 25   aren't numbered, so why don't you count from the

11:43:35  1    beginning and tell me what page number that is.

11:44:11  2         A.  I know there is, because I wrote it down.

11:44:05  3         Q.  Have you found -- after the third page, is

11:44:10  4    there any description -- on the third page you describe

11:44:14  5    the meeting with the people from San Antonio.  And

11:44:16  6    after that meeting, do you describe any sexual

11:44:19  7    harassment?

11:44:36  8         A.  Well, there is something about Loya.

11:44:38  9         Q.  There is something about Loya that Loya didn't

11:44:41 10    give you loads and stuff like that.

11:44:44 11         A.  Yes, but it was that he was sexually harassing

11:44:46 12    me.

11:44:50 13         Q.  Take your time.

11:44:52 14         A.  I wrote everything down.  You have to excuse me

11:45:10 15    a little bit, because I don't see that well.  Okay.

11:45:26 16    Here it is.

11:45:27 17         Q.  Okay.

11:45:27 18         A.  On the front page.

11:45:28 19         Q.  All right.  That's the front page.

11:45:29 20         A.  Yes, the front page.  Mr. Loya would start

11:45:32 21    bothering me to help with the paperwork at the office.

11:45:34 22         Q.  Okay.  And the reason I'm asking you this, this

11:45:38 23    document appears to be written in order of how things

11:45:42 24    happened.

11:45:42 25         A.  Oh.

11:45:43 1    Q.  And what I want to know --

11:45:46 2    A.  There were parts -- I was typing, right, and I

11:45:5? 3   was tired.  I would jump.

1:45:51 4    Q.  Okay.  So what paragraph do you see on the

11:45:56 5   first page --

11:45:5? 6    A.  On the first page.

11:45:5? 7    Q.  Okay.  And what page --

11:46:00 8    A.  Right here, sir.  "As the week passed by, I

11:46:04 9   noticed my assistant manager Mr. Loya would start

11:46:06 10  bothering me to help with the paperwork at the office

11:46:10 11  especially on Sundays."

11:46:12 12   Q.  Okay.  Let's talk about that.  You know, in the

11:46:17 13  first paragraph on this page you say you started

11:46:20 14  working on September 1st, 1996.

11:46:23 15   A.  Uh-huh.

         16   Q.  Is that correct?

11:46:25 17   A.  But I'm not too sure it's 1 or 2.

11:46:2? 18   Q.  1 or 2, and that's not a major thing in this

11:46:29 19  case.  Then you talk about in the second paragraph

11:46:33 20  about Linda Garcia being hired.

11:46:35 21   A.  Uh-huh.

11:46:36 22   Q.  And --

11:46:37 23   A.  Because I jumped.

11:46:38 24   Q.  That's fine.

11:46:38 25   A.  I just put the --

11:46:40  1      Q.  Linda came after you.  Linda was hired after

11:46:43  2   you were hired, so it makes sense to talk about Linda

11:46:46  3   next.

11:46:46  4      A.  Uh-huh, yes, sir.

11:46:49  5      Q.  You may be wrong on those dates, but it

11:46:52  6   occurred --

11:46:52  7      A.  It occurred how I'm saying.  I don't have the

11:46:55  8   right dates.

11:46:58  9      Q.  Okay.

11:46:58 10      A.  Because I never thought when I started working

11:47:00 11   for Coastal that they were going to ask me for this.

11:47:05 12      Q.  And then you say, "A few months later, the

11:47:07 13   assistant manager" -- and this is the paragraph that

11:47:09 14   we're talking about -- "Mr. Loya, Robert Torres, Linda,

11:47:13 15   and I were at the office.  And at that time, Robert

11:47:15 16   Torres' wife honked from the car, and Robert went

11:47:18 17   outside to talk to his wife while Linda waited in the

11:47:21 18   mechanic's room for him.

11:47:23 19           "Mr. Loya walked to the window and through

11:47:27 20   the venetian blinds to peep outside.  He then told

11:47:30 21   me" -- and I'll say this in Spanish, and then I'll say

11:47:34 22   it -- I'll translate it, and you tell me if the

11:47:35 23   translation is right.

         24           It says, "Hey, Chaparra, yo quisiera andar

11:47:43 25   contigo como Linda y Robert."  And the translation in

11:47:44  1    my mind is, "Hey, shorty," or, "Hey, little woman, I

11:47:49  2    would like to be with you like Linda and Robert are."

11:47:53  3    Is that about -- would you agree with that translation?

11:47:56  4        A.   Yes.

11:47:57  5        Q.   Okay.   "And I screamed to him, 'Estas loco.'

11:48:02  6    'You're crazy.'   And then I took off to my home."   Let

11:48:05  7    me ask you this:   Up to this point, are we talking

11:48:09  8    about incidents that occurred before Loya was

11:48:13  9    reprimanded or after?

11:48:14  10       A.   Before.

11:48:15  11       Q.   Okay.   And then it says, "As the weeks passed

11:48:18  12   by, I noticed my assistant manager Mr. Loya would start

11:48:20  13   to bother me with the paperwork at the office

11:48:23  14   especially on Sundays while I waited for the next

11:48:27  15   load."   Are you talking about before?

11:48:28  16       A.   Before.

11:48:29  17       Q.   "No one was at the office.   He told me to help

11:48:31  18   him at the office because he said he needed help, and

11:48:35  19   his excuse is that I didn't have a load at that time.

11:48:38  20   He also said there are no loads.   Everyone left to

11:48:41  21   work, and I was left standing around."   Are we talking

11:48:44  22   before or after?

11:48:45  23       A.   Before and after.   Well, that was before and

11:48:48  24   after when I put the finger at him like I told you

11:48:53  25   about it, and he did that to me.

Q.   So when you write about standing around, you sometimes stood around afterwards too?

A.   Uh-huh.

Q.   "Then I noticed he gave everybody loads, and he didn't give me a load; therefore, I waited for a load longer than usual.  Then he would say, 'Help me with the paperwork, mamacita.'

"And I would tell him, 'Yeah, ya apaciguate.'"  And I'm going to say this in Spanish, and then we'll translate, and you tell me if it's right.  "Si quieres que te ayude con los papeles ya damelos para hacertelos."  And that means, like -- I think what the translation is, you know, "Calm down," or "Stop it."

A.   Or "Behave yourself."

Q.   "Behave yourself.  If you want someone to help you with paperwork, just give me the paper, and I'll do them."  Is that right?

A.   Uh-huh, "I will help you."

Q.   "'I will help you.'  And sometimes I would say, 'Stop talking to me about that.'  And I felt uncomfortable because this was not my job; however, I did start to help him because he would tell me that, 'Anyway you are still getting paid for four hours.'  After the four hours lapsed, I would go home.

11:49:54  1          "I would -- I helped him on two or three

11:49:57  2     Sundays.  Neither of these Sundays was anybody around.

11:50:00  3     On the third Sunday, he forced a kissed on me, and he

11:50:04  4     hugged me.  I pushed him away, and I was very upset.

11:50:07  5     He started saying, 'I am sorry.  I am sorry.'  I just

11:50:20  6     took off to my house feeling embarrassed and upset."

11:50:20  7     Was this before or after?

11:50:20  8          A.  After.

11:50:20  9          Q.  Okay.

11:50:20 10          A.  After.

11:50:21 11          Q.  Is this a different incident than the one we

11:50:23 12     talked about before?

11:50:24 13          A.  No.  It's the same incident.

11:50:27 14          Q.  Okay.  Before you've testified --

11:50:29 15          A.  Uh-huh, before -- okay.  Was before.

11:50:32 16               MR. SIERRA:  Let him finish first.

11:50:34 17          Q.  I know sometimes the word -- you have trouble

11:50:34 18     with before and after.  Was this before -- maybe let me

11:50:38 19     do a full sentence to make sure we clarify.  Was this

11:50:41 20     before he was reprimanded?

11:50:44 21          A.  It was on both before and after, because he

11:50:47 22     continued doing it.

11:50:48 23          Q.  You're saying -- but when you were describing

11:50:51 24     this particular incident, this is the Sunday kiss?

11:50:53 25          A.  Uh-huh.

11:50:54  1      Q.  You remember that?

11:50:56  2      A.  Okay.  Then it was before.

11:50:59  3      Q.  This particular kiss that you're describing is

11:51:00  4  the one that occurred before he was reprimanded.

11:51:03  5      A.  Before.

          6      Q.  Is that correct?

11:51:05  7      A.  Yes, sir.

11:51:05  8      Q.  I know you've testified today that he kissed

11:51:08  9  you on other occasions.  And what I'm asking you right

11:51:10 10  now is about what's described in your written document.

11:51:14 11      A.  Right.

11:51:14 12      Q.  And the document -- what you're describing in

11:51:16 13  this particular letter to the EEOC is a before

11:51:20 14  incident.  When I say a before incident, that occurred

11:51:23 15  before he was reprimanded.

11:51:24 16      A.  Uh-huh.

          17      Q.  Is that correct?

11:51:26 18      A.  Yes.

11:51:30 19      Q.  Okay.  And then let's go to the next page just

11:51:33 20  to -- I think we talked about this, but I'm just

11:51:37 21  trying -- it says, "A month later, the company had a

11:51:39 22  safety meeting.  At the meeting, Linda said that she

11:51:43 23  needed someone to come to the terminal."  This was the

11:51:45 24  safety meeting that led to the investigation; is that

11:51:49 25  correct?

A.  Correct.

Q.  So what's on this first page, would you agree with me, mostly concerns or concerns almost completely stuff that occurred before the investigation?

A.  Uh-huh, yes, sir.

Q.  Is that correct?

A.  Uh-huh.

MR. BACON:  Okay.  Why don't we take another break.

(Brief recess)

Q.  I want to talk about Manuel Garza now.  I believe -- you know, we talked a little bit about Manuel Garza earlier today.  Manuel Garza, what was his position?

A.  Manager.

Q.  Okay.  Was he the person who made employment decisions at the Harlingen terminal?

A.  Yes, sir.

Q.  He was in charge?

A.  Uh-huh.

Q.  Okay.  I believe your testimony a moment ago was you got along very well with Garza in the beginning.

A.  Yes, sir.

Q.  When did you begin to have problems with Manuel

12:42:13  1          One way you were discriminated against was

12:42:19  2    when you were out on medical leave and you came back,

12:42:24  3    you would not get the truck that you had before medical

12:42:27  4    leave.

12:42:27  5          A.   Uh-huh.

12:42:28  6          Q.   Is that correct?

12:42:29  7          A.   Yes, sir.

12:42:32  8          Q.   And the other way you got discriminated against

12:42:36  9    is that you believed that you were not getting as many

12:42:40 10    opportunities for loads as other drivers?

12:42:45 11          A.   True.  Yes, sir.

12:42:47 12          Q.   You were -- compared to the male drivers, you

12:42:49 13    had fewer opportunities to make money --

12:42:52 14          A.   Yes, sir.

12:42:52 15          Q.   -- than they did; is that correct?

12:42:54 16          A.   Yes, it's correct.

12:42:56 17          Q.   Obviously, the more loads you have, the more

12:42:59 18    money you make.

12:42:59 19          A.   Yes, sir.  And I bring more money to the

12:43:00 20    company.

12:43:01 21          Q.   And you bring more money to the company.  All

12:43:02 22    right.  We're going to talk about each of these in

12:43:04 23    detail, but I want to get them all on the table, then

12:43:07 24    we'll talk about them.

12:43:07 25          Any other way that you felt that you were

time.

Q. You don't know if other drivers had to wait or not?

A. No.

Q. Let's go back. Can you think of anything else, before we start talking about each of the individual complaints?

A. Only that I had been changing trucks and trailers every single day.

Q. It is my understanding -- correct me if I'm wrong -- that the trucks at the Harlingen terminal are generally assigned by seniority; is that correct?

A. True.

Q. The drivers who have been there the longest get the best and newest trucks?

A. Yes, sir.

Q. The drivers who've been there the least, probably don't get the same truck. They're at the bottom of the list, and they basically take whichever truck is off for the day?

A. Yes, sir, but I had seniority there.

Q. One step at a time. That's generally how trucks are assigned at Coastal; is that correct?

A. Yes, sir.

Q. It is my understanding from what you're telling

12:47:53  1    me is that if you were out on medical leave for an
12:47:57  2    extended period of time, when you returned, Mr. Garza
12:48:01  3    would put you at the bottom of the list.
12:48:03  4        A.  Yes, sir.
12:48:05  5        Q.  In other words, you would sort of start over
12:48:06  6    again?
12:48:07  7        A.  Yes, sir.
12:48:07  8        Q.  So if you had a particular truck because of
12:48:09  9    seniority and you returned, you might end up with
12:48:15 10    whatever truck was available?
12:48:16 11        A.  Yes, but other drivers were hurt too, and they
12:48:19 12    would get --
12:48:20 13        Q.  Ms. Olmos --
12:48:21 14        A.  -- the new trucks.
12:48:22 15        Q.  Ms. Olmos, please answer my question.  We'll
12:48:23 16    get out of here quicker if you do that.
12:48:27 17            I want to clarify and get some information
12:48:30 18    from you.  If you were gone -- if you were sick for a
12:48:33 19    couple of days and then came back, did that happen, or
12:48:39 20    was it only when you took an extended medical leave?
12:48:44 21        A.  When I was --
12:48:45 22        Q.  If you went on vacation for a week, you dropped
12:48:48 23    seniority?
12:48:51 24        A.  I never had seniority with the company.  My
12:48:54 25    four years, I never had seniority.

12:52:16 1    A.  Yes.

12:52:17 2    Q.  Who?

12:52:19 3    A.  I don't remember, sir.

12:52:20 4    Q.  Do you remember if that driver had their own

12:52:22 5    truck?

12:52:25 6    A.  I don't remember, sir.

12:52:27 7    Q.  Okay.  But the most senior driver, whoever that

12:52:31 8    was, had the best truck?

12:52:34 9    A.  I don't remember.

12:52:35 10   Q.  Okay.  You don't remember.  You just remember

12:52:36 11   you didn't have a truck?

12:52:37 12   A.  Uh-huh.

12:52:39 13   Q.  And you did remember that trucks were assigned

12:52:40 14   by seniority.

12:52:41 15   A.  Uh-huh.

16   Q.  Is that correct?

12:52:42 17   A.  Yes, sir.

12:52:45 18   Q.  Okay.  You're not complaining in 1997 about the

12:52:49 19   truck that you had?

12:52:50 20   A.  No.

12:52:55 21   Q.  Okay.  In 1998, did you have your own truck

12:52:58 22   before you took off two weeks in July?

12:53:01 23   A.  Yes, sir.

12:53:04 24   Q.  Okay.  What truck were you driving?

12:53:05 25   A.  727.

Q.  You had the 727?

A.  With trailer 320.

Q.  And, you know, we'll be able to check this because we have the records, but when you returned after 12 days --

A.  Uh-huh.

Q.  -- in 1998, were you still driving the 727 at that time?

A.  Yes, sir.

Q.  Okay.  So you were gone for 12 days.  Mr. Garza didn't knock you down at the bottom of the seniority list --

A.  No.

Q.  -- in 1998?

A.  No, sir.

Q.  You still kept your seniority --

A.  With the same truck and the same trailer.

Q.  Same truck and same trailer?

A.  Right.

Q.  And you drove 727 through the rest of 1998; is that correct?

A.  Uh-huh, until my surgery.

Q.  Okay.  In 1998, you're still driving that truck?

A.  That truck, right.

12:53:53  1      Q.  727?

12:53:54  2      A.  Yes, sir.

12:53:5?  3      Q.  Okay.  Now, in 1999, you're out for surgery.

12:54:0?  4      A.  Uh-huh.

12:54:08  5      Q.  Is that correct?

12:54:09  6      A.  Yes, sir.

12:54:09  7      Q.  You're out through almost January, February,

12:54:12  8  and most of March?

12:54:14  9      A.  Yes, sir.

12:54:15 10      Q.  Okay.  When you returned at the end of your

12:54:17 11  surgery in 1999, was that when you were knocked down?

12:54:23 12      A.  Yes, sir.

12:54:25 13      Q.  Was someone else driving 727?

12:54:27 14      A.  Yes, sir.

12:54:28 15      Q.  Who was driving 727 at that time?

12:54:30 16      A.  I don't know, sir.

12:54:32 17      Q.  Okay.  But you really had to go to the bottom

12:54:35 18  of the list again and work up again?

12:54:37 19      A.  Yes, sir.  At that time when I returned, some

12:54:39 20  other -- two or three drivers came along almost the

12:54:42 21  same period, and Garza gave them the new trucks.

12:54:47 22          So that's why I say there were drivers --

12:54:52 23  where's the bottom?  Okay.  They say go to the bottom,

12:54:55 24  then Gonzalez should go to the bottom, the one that got

12:54:5? 25  fired, he would have gone to the bottom too.

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

13:11:07  1    because you were a woman?

13:11:09  2        A.  Yes, sir.

13:11:09  3        Q.  Let me ask you a couple of things.  In this

13:11:13  4    charge, you don't make any mention about Loya's sexual

13:11:16  5    harassment.

13:11:17  6        A.  That's when I made the police report, sir, this

13:11:19  7    time.  It's -- I have a police report.

13:11:22  8        Q.  Right.  But when you went to the EEOC --

13:11:25  9        A.  No, I didn't mention it.

13:11:27 10        Q.  -- you didn't complain about Loya's sexual

13:11:39 11    harassment.  You complained about some things.

13:11:39 12        A.  Yes.

13:11:39 13        Q.  But at that time, you did not complain --

13:11:39 14        A.  Not to here, but I did complain to the police

13:11:39 15    department.

13:11:39 16        Q.  You complained to the police department, but

13:11:39 17    you didn't complain to the EEOC?

13:11:40 18        A.  No, right.  Yes, sir.

13:11:41 19        Q.  And you mean, "Yes, sir I did not complain to

13:11:42 20    the EEOC"?

13:11:43 21        A.  Yes, sir.

13:11:46 22        Q.  Okay.  After you filed this charge of

13:11:48 23    discrimination -- and you were working at Coastal when

13:11:53 24    you filed this; is that correct?

13:11:55 25        A.  Yes, sir.

13:11:58 1    Q.  Coastal's management from San Antonio came down

13:11:59 2    to investigate what you had alleged here.

13:12:00 3    A.  Yes, sir.

13:12:02 4    Q.  You remember having a discussion with

13:12:06 5    Ms. Carlin --

13:12:07 6    A.  Yes, sir.

13:12:07 7    Q.  -- and the company lawyer again, and Ms. Carlin

13:12:10 8    asked you about the claims that you had raised here.

13:12:14 9    A.  Yes, sir.

13:12:14 10   Q.  And one of the things you complained about to

13:12:17 11   Ms. Carlin was, you complained to Ms. Carlin that you

13:12:20 12   had not gotten -- that you had not gotten a truck and

13:12:23 13   you felt it was, you know -- you'd gone off on leave

13:12:27 14   and when you came back on leave, they gave you no

13:12:29 15   truck.

13:12:29 16   A.  Many months had passed.

13:12:31 17   Q.  And you complained about that to Ms. Carlin?

13:12:34 18   A.  Yes, sir.

13:12:36 19   Q.  After you complained to Ms. Carlin, you were

13:12:38 20   assigned a truck.

13:12:43 21   A.  Yes, sir, the same truck.

13:12:45 22   Q.  The 727?

13:12:47 23   A.  Yes, but that was only the change.

13:12:49 24   Q.  But that was one -- you were complaining that

13:12:55 25   you didn't have a truck?

13:17:43 1  there was the mediation. Nothing was talked about

13:17:43 2  then. This was about the time before the mediation

13:17:51 3  where Ms. Carlin came down to investigate and this was

13:17:55 4  in Harlingen.

13:17:56 5      A.  Okay.  Harlingen terminal.

13:17:57 6      Q.  And she talked to you about these particular

13:18:01 7  things.  I don't think it was at the Harlingen

13:18:03 8  terminal.  I think you met somewhere else in Harlingen

13:18:05 9  with her, maybe at a restaurant?

13:18:08 10     A.  Yes, yes.

13:18:09 11     Q.  You remember that?

13:18:10 12     A.  Uh-huh, I remember.

13:18:12 13     Q.  You met at Denny's?

13:18:15 14     A.  Yes, yes, right.

13:18:15 15     Q.  During that meeting, she asked you about the

13:18:17 16  truck, and you explained what had happened about the

13:18:19 17  truck.

13:18:20 18     A.  Right.

13:18:20 19     Q.  That you didn't have your own truck.

13:18:22 20     A.  Uh-huh.

13:18:22 21     Q.  And you thought that was unfair?

13:18:23 22     A.  Uh-huh.

13:18:24 23     Q.  Is that correct?

13:18:25 24     A.  It's correct.

13:18:26 25     Q.  And she asked you to explain why you felt you

13:18:29  1    were owed money, and you talked about that.

13:18:31  2         A.   Yes, sir.

13:18:33  3         Q.   And the truck was taken care of.  You got a

13:18:35  4    truck shortly after that?

13:18:36  5         A.   Yes, sir.

13:18:37  6         Q.   Maybe a day after or two days after?

13:18:39  7         A.   Uh-huh, yes, sir.

13:18:39  8         Q.   All right.  Do you -- and during this meeting,

13:18:42  9    I think I asked you a moment ago, Ms. Carlin also asked

13:18:47 10    you, even though it wasn't in this EEOC charge, she

13:18:49 11    said, "Are you having any problems with Manuel Loya?

13:18:51 12    Is he still bothering you?"  And you told her no?

13:18:53 13         A.   I said no because the reason was, I was afraid

13:18:56 14    of him, and I was afraid to lose my job right and

13:18:59 15    there.

13:19:00 16         Q.   But she asked you that --

13:19:01 17         A.   She did, but I was afraid.

13:19:03 18         Q.   -- and you didn't tell her?

13:19:04 19         A.   No.  I wanted to, but those many times I called

13:19:12 20    her, I wanted to tell her, but I was going to lose my

13:19:17 21    job or they would do something to me.

13:19:24 22         Q.   You said there was a cookout.  The second thing

13:19:26 23    you talked about was the payroll, and I think the best

13:19:29 24    thing to do is just look at the payroll records.

13:19:30 25              I'm going to move to the third one, the

time did you come in?  Man, he's really putting on you.

He doesn't want you in the company."

Q.  Could you tell me was it the entire time you

worked at Coastal that you made less than the male

drivers, or was it just a certain period of time?

A.  The certain period of time when I came back.

Q.  When you came back.  And when you say when you

came back, what are we talking about?

A.  From the surgery.

Q.  From the surgery?

A.  From the surgery and from the terminated me,

both.

Q.  The time period you're talking about is from

March -- or April 1999 on, you were making less than

other drivers?

A.  Uh-huh.  When they terminated me and when I

came back, it was worse.

Q.  So that was in May of 1999?

A.  Right, sir.

Q.  Okay.  So you're not complaining about the time

before the surgery?

A.  No, sir.  Before the surgery, I mean,

everything was fine, me and Garza.

Q.  But after the surgery -- and that's surgery in

March of 1999 -- or January of 1999, when you came back

13:27:54 1    in March or April, you made less than the other

13:27:59 2    drivers?

13:27:59 3        A.  Yes.  When I reported to Tammy, the loads went

13:28:02 4    up, but they went up, but with the time expanded.  So I

13:28:08 5    would be 1:00 all the way to -- 1:00 in the morning --

13:28:11 6    1:30 in the morning all the way to 5:00.

13:28:14 7        Q.  So when you talked to Tammy, you talked to

13:28:15 8    Tammy in December or January of 2000.

13:28:17 9        A.  Uh-huh.

13:28:18 10       Q.  Is that correct?

13:28:19 11       A.  Yes, sir.

13:28:19 12       Q.  So the time period -- if we're going to look at

13:28:22 13   a particular time period to see if you were being paid

13:28:26 14   less than other people, the time period to look at

13:28:29 15   would be March or April 1999 -- not March, because you

13:28:32 16   didn't work all of March -- April 1999 through December

13:28:35 17   1999.  Would you agree with that?

13:28:38 18       A.  Yes.  And I agree also if -- you're talking

13:28:40 19   about time period to show up the logbooks too to see

13:28:43 20   how much time -- the same amount of money the other

13:28:47 21   driver did and I, how much -- how much time it expanded

13:28:53 22   if you go by the logbooks.

13:28:57 23           Because you're talking about the time

13:29:00 24   period, but you also need to see the logbooks, the

13:29:03 25   time.  He started sending me all the way to San Antonio

222

1                    SIGNATURE OF BLANCA OLMOS

2        I have read the foregoing transcript of my

3    deposition and it is a true and accurate record of my

4    testimony given on MARCH 22, 2001 except as to any

5    corrections I have listed on page 221 herein.

6                                 _____
                                  BLANCA OLMOS
7

8

9    THE STATE OF TEXAS

10   COUNTY OF CAMERON

11               SUBSCRIBED AND SWORN TO BEFORE ME, the

12   undersigned authority on this the _____ day of

13   _____, 2001.

14

15                                _____
                                  Notary Public in and for
16                                The State of Texas

17   My commission expires:

18   _____

19

20

21

22

23

24

25

223

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
2                     BROWNSVILLE DIVISION

3     BLANCA OLMOS,               )(
              Plaintiff           )(
4                                 )(
      VS.                         )(   CIVIL ACTION NO. 01-016
5                                 )(
      COASTAL TRANSPORT,          )(
6             Defendant           )(

7                     REPORTER'S CERTIFICATE

8          I, Donna McCown, Certified Court Reporter, certify

9     that the witness, BLANCA OLMOS, was duly sworn by me,

10    and that the deposition is a true and correct record of

11    the testimony given by the witness on MARCH 22, 2001;

12    that the deposition was reported by me in stenograph

13    and was subsequently transcribed under my supervision.

14         I FURTHER CERTIFY that I am not a relative,

15    employee, attorney or counsel of any of the parties,

16    nor a relative or employee of such attorney or counsel,

17    nor am I financially interested in the action.

18                   WITNESS MY HAND on this the 26th day of

19    ___March_____, 2001.

20

21    _____Donna McCown_____
      DONNA McCOWN, CSR NO. 6625
22    Expiration Date: 12/31/01
      Bryant & Stingley, Inc.
23    2010 East Harrison
      Harlingen, Texas  78550

24

25
```

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| BLANCA OLMOS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 01-016 |
| | § | |
| COASTAL TRANSPORT, | § | |
| | § | |
| Defendant. | § | |

## A F F I D A V I T

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

BEFORE ME, the undersigned authority, on this day personally appeared Tammy Carlin, being by me duly sworn on her oath, and she deposed and stated as follows:

1.     My name is Tammy Carlin.  I am over eighteen (18) years of age, of sound mind, and have never been convicted of a crime, and am in all respects competent to make this Affidavit.

2.     I am the Human Resources Supervisor for Coastal Transport Company, Inc. ("Coastal").  I work out of Coastal's main office in San Antonio, Texas.

3.     Coastal has a policy prohibiting sexual harassment which it has distributed to all of its employees.  In that policy, employees are urged to report any incidents of harassment to management.  Blanca Olmos was given a copy of this policy.

4.     In August 1997, I received a complaint from Linda Garcia, one of the two female drivers at Coastal's Harlingen terminal, that she had been sexually harassed by Manuel Garza, the manager of that terminal.

5.      Shortly after receiving the Complaint, I traveled to Harlingen to conduct an investigation of Ms. Garcia's claim.  I interviewed virtually all of the employees at the Harlingen terminal including Blanca Olmos.

6.      In her interview, Blanca Olmos told me that she had not witnessed any evidence of Garza sexually harassing Garcia.  Olmos also told me that she had not been sexually harassed by Garza.   However, Olmos did complain that Manuel Loya, the assistant manager and dispatcher at the Harlingen terminal, had been constantly asking her out on dates and that this had made her uncomfortable.  Olmos did not tell me that Loya had attempted to kiss her or that he had tried to touch her.  Moreover, this was the only time that Olmos ever complained to me about Loya.

7.      During the interview, I told Olmos that Loya's conduct was inappropriate.  I reminded her that Coastal had a policy prohibiting sexual harassment and that Coastal would not tolerate any form of sexual harassment.  I also told Olmos that I would talk to Loya about his conduct and I urged Olmos to report to me any further problems that she might have with Loya.

8.      When Coastal's management confronted Loya, he denied asking Olmos out on a date.  Nonetheless, he was warned that if Coastal received another substantive claim against him that he would be subject to immediate termination.  A written warning, signed by Loya on September 4, 1997, was placed in his file.

9.      In late May, 1999, Blanca Olmos called me to complain that she had been terminated by Manuel Garza for having an accidental spill at a Circle K.  After I conducted a further investigation into this incident, I learned that Garza had not terminated Olmos for the accidental spill but because Olmos had failed to report the spill.  While Olmos disputed Garza's contention that she had not reported the spill, after talking with the dispatcher who was on duty

2

at the time of the spill, I determined that Olmos had not reported the spill even though she had called in. However, I also determined that Olmos had reported having some problem with her delivery although she had not indicated the seriousness of the problem or that the problem had been a spill. Realizing that Olmos' failure to report the spill may have been a result of Olmos' inability to communicate, I gave her the benefit of the doubt and I recommended that Garza reinstate Olmos and treat the five days that she had missed as a suspension without pay.

10.     In February 2000, I received a Charge of Discrimination that Olmos had filed with the Equal Employment Opportunity Commission which was dated December 23, 1999. In that Charge of Discrimination, Olmos complained that she had been discriminated against because of her gender. Shortly after receiving that Charge of Discrimination, I met with Olmos in Harlingen to discuss her complaints. During my conversation with Olmos I asked her if Loya had continued to harass her after she had complained to me about him in 1997. Olmos told me that he had not and that the reason she had filed her recent EEOC Charge was because she felt that Manuel Garza, the terminal manager, had discriminated against her by not reassigning her to the truck that she had driven prior to going out on medical leave, and by assigning her less profitable loads.

11.     After meeting with Olmos I investigated her complaints of discrimination. I determined that Garza had not discriminated against her because of her gender when he had not reassigned her to her old truck after she had been out for an extended medical leave and that Garza had treated male drivers on leave in the same way. However, I instructed Garza to reassign Olmos to her old truck and to change his policy regarding truck assignments when drivers were out on medical leave which was no fault of their own. Olmos was reassigned to her old truck.

3

12.     With respect to Olmos' claim that she had been treated less favorably than male drivers in that she had been given less profitable truck assignments, I compared Olmos' earnings with those of all of the other drivers at the Harlingen terminal for the second half of 1999 and determined that Olmos average bi-weekly pay ($1,175.90) was slightly greater than the average bi-weekly pay ($1,160.60) for the average driver at the Harlingen terminal.  Attached to this Affidavit are true and correct pay records for all of the drivers at the Harlingen terminal from July 1, 1999 through December 31, 1999.  Based on my review of these records, I concluded that Olmos had not been discriminated against in her pay or in her assignments.

13.     On May 5, 2000, Olmos was injured at work and began receiving worker's compensation benefits.  It is Coastal's policy to allow employees who are unable to work to remain on unpaid leave for 13-weeks.  Olmos was terminated at the end of the 13-week period, on August 24, 2000, because she advised me that she was still not able to return to work.  At the time that Olmos was terminated, I advised her that she could reapply for employment when she was able to work again.  Olmos has never submitted a new application for employment.

14.     Further affiant saith not.

_____
TAMMY CARLIN

SUBSCRIBED AND SWORN TO BEFORE ME on this _23_ day of July, 2001.

_____
Notary Public, State of Texas

> PAT R. SHOMETTE
> Notary Public, State of Texas
> My Commission Expires
> **January 26, 2004**

608298_1.DOC

4

Case 1:01-cv-00016   Document 18   Filed in TXSD on 07/30/2001   Page 103 of 129

Coastal Transport Co., Inc.
Drivers' Pay Summary
Tue Feb 15, 2000 08:57:26.64

Harlingen Terminal

Period From: 07/01/1999 to 07/15/1999

| Driver | | Total Pay | Total Shipments | Percentage of Total Pay | Percentage of Total Shipments |
|--------|--|-----------|-----------------|-------------------------|-------------------------------|
| 0916 | VICTOR PEREZ | 1554.54 | 55 | 5.2697 | 5.7232 |
| 1839 | APOLONIO OLIVAREZ | 1521.39 | 44 | 5.1573 | 4.5786 |
| 0917 | ROSALIO PORTALES | 1435.96 | 45 | 4.8677 | 4.6826 |
| 2242 | JOSE GUERRERO | 1422.60 | 46 | 4.8224 | 4.7867 |
| 2183 | ALBERT ANCISO | 1360.14 | 41 | 4.6107 | 4.2664 |
| 1428 | BLANCA OLMOS | 1302.85 | 37 | 4.4165 | 3.8502 |
| 2265 | JUAN RAMIREZ | 1288.14 | 40 | 4.3666 | 4.1623 |
| 2148 | SEFERINO RIVERA | 1287.20 | 38 | 4.3634 | 3.9542 |
| 2187 | RAFAEL PENA, JR. | 1245.17 | 36 | 4.2210 | 3.7461 |
| 2155 | DAVID DAVILA, JR. | 1236.57 | 45 | 4.1918 | 4.6826 |
| 1947 | GENARO SOTO | 1235.32 | 43 | 4.1876 | 4.4745 |
| 1101 | JUAN DELAROSA | 1227.73 | 38 | 4.1618 | 3.9542 |
| 1973 | DANIEL GONZALES, JR | 1207.96 | 38 | 4.0948 | 3.9542 |
| 2186 | JESUS MEDRANO, JR. | 1199.60 | 39 | 4.0665 | 4.0583 |
| 2292 | CARLOS PEREZ | 1168.32 | 38 | 3.9604 | 3.9542 |
| 2201 | ANTHONY SALVO | 1167.76 | 44 | 3.9586 | 4.5786 |
| 1218 | ROBERTO TORRES | 1162.40 | 38 | 3.9404 | 3.9542 |
| 0023 | JOSE ORTIZ | 1142.81 | 38 | 3.8740 | 3.9542 |
| 2188 | JUAN MARTINEZ | 1106.45 | 36 | 3.7507 | 3.7461 |
| 2275 | CURTIS KEMMERLING | 1086.50 | 35 | 3.6831 | 3.6420 |
| 2298 | JOSE CASTRO | 1062.05 | 37 | 3.6002 | 3.8502 |
| 2243 | PEDRO MEDRANO | 1043.03 | 37 | 3.5357 | 3.8502 |
| 2261 | JUAN SALINAS | 985.53 | 35 | 3.3408 | 3.6420 |
| 2185 | PEDRO BORREGO III | 927.31 | 33 | 3.1435 | 3.4339 |
| 1764 | MIGUEL SOTO | 122.36 | 5 | .4148 | .5203 |

Average Driver Pay for 25 Drivers: 1179.99   38   4.0000   3.9542

Terminal Totals: 29499.69   961

Coastal Transport Co., Inc.
Drivers' Pay Summary
Tue Feb 15, 2000  09:24:16.45

Harlingen Terminal

Period From: 07/16/1999 to 07/31/1999

| Driver | | Total Pay | Total Shipments | Percentage of Total Pay | Percentage of Total Shipments |
|---|---|---|---|---|---|
| 0916 | VICTOR PEREZ | 1710.75 | 57 | 5.0445 | 5.0398 |
| 0023 | JOSE ORTIZ | 1665.47 | 54 | 4.9110 | 4.7745 |
| 1947 | GENARO SOTO | 1537.32 | 47 | 4.5331 | 4.1556 |
| 1101 | JUAN DELAROSA | 1517.29 | 50 | 4.4740 | 4.4209 |
| 2342 | JOSE GUERRERO | 1470.28 | 56 | 4.3354 | 4.9514 |
| 1973 | DANIEL GONZALES, JR | 1470.23 | 50 | 4.3353 | 4.4209 |
| 2186 | JESUS MEDRANO, JR. | 1434.79 | 41 | 4.2308 | 3.6251 |
| 1839 | APOLONIO OLIVAREZ | 1412.54 | 44 | 4.1651 | 3.8904 |
| 2265 | JUAN RAMIREZ | 1382.04 | 51 | 4.0752 | 4.5093 |
| 1218 | ROBERTO TORRES | 1371.17 | 44 | 4.0432 | 3.8904 |
| 2187 | RAFAEL PENA, JR. | 1363.52 | 43 | 4.0206 | 3.8019 |
| 1428 | BLANCA OLMOS | 1348.76 | 46 | 3.9771 | 4.0672 |
| 2188 | JUAN MARTINEZ | 1331.68 | 42 | 3.9267 | 3.7135 |
| 2155 | DAVID DAVILA, JR. | 1325.15 | 40 | 3.9075 | 3.5367 |
| 2183 | ALBERT ANCISO | 1321.51 | 46 | 3.8967 | 4.0672 |
| 2243 | PEDRO MEDRANO | 1316.67 | 45 | 3.8825 | 3.9788 |
| 0917 | ROSALIO PORTALES | 1269.41 | 40 | 3.7431 | 3.5367 |
| 2148 | SEFERINO RIVERA | 1269.24 | 39 | 3.7426 | 3.4483 |
| 2298 | JOSE CASTRO | 1223.59 | 41 | 3.6080 | 3.6251 |
| 2275 | CURTIS KEMMERLING | 1213.81 | 39 | 3.5792 | 3.4483 |
| 2292 | CARLOS PEREZ | 1196.59 | 36 | 3.5284 | 3.1830 |
| 2185 | PEDRO BORREGO III | 1171.89 | 41 | 3.4555 | 3.6251 |
| 2361 | JUAN SALINAS | 1136.88 | 40 | 3.3523 | 3.5367 |
| 2201 | ANTHONY SALVO | 1133.98 | 41 | 3.3438 | 3.6251 |
| 1976 | HENRY GONZALES | 737.09 | 29 | 2.1735 | 2.5641 |
| 2389 | SERGIO GRANADO | 581.69 | 29 | 1.7152 | 2.5641 |

Average Driver Pay for 26 Drivers:   1304.36   44   3.8462   3.8904

Terminal Totals:   33913.34   1131

Coastal Transport Co., Inc.
Drivers' Pay Summary
Tue Feb 15, 2000 10:00:59.68

Harlingen Terminal

Period From: 08/01/1999 to 08/15/1999

| Driver | | Total Pay | Total Shipments | Percentage of Total Pay | Percentage of Total Shipments |
|---|---|---|---|---|---|
| 2242 | JOSE GUERRERO | 1588.76 | 55 | 5.0841 | 5.1258 |
| 1839 | APOLONIO OLIVAREZ | 1490.28 | 46 | 4.7690 | 4.2870 |
| 1976 | HENRY GONZALES | 1452.43 | 52 | 4.6478 | 4.8462 |
| 1947 | GENARO SOTO | 1410.65 | 46 | 4.5141 | 4.2870 |
| ?187 | RAFAEL PENA, JR. | 1302.23 | 44 | 4.1672 | 4.1007 |
| 0917 | ROSALIO PORTALES | 1291.29 | 45 | 4.1322 | 4.1938 |
| 1973 | DANIEL GONZALES, JR | 1277.22 | 42 | 4.0872 | 3.9143 |
| 2183 | ALBERT ANCISO | 1251.51 | 41 | 4.0049 | 3.8211 |
| 1218 | ROBERTO TORRES | 1242.64 | 43 | 3.9765 | 4.0075 |
| ?265 | JUAN RAMIREZ | 1214.94 | 43 | 3.8879 | 4.0075 |
| ?155 | DAVID DAVILA, JR. | 1210.72 | 41 | 3.8744 | 3.8211 |
| ?298 | JOSE CASTRO | 1196.72 | 41 | 3.8296 | 3.8211 |
| 1101 | JUAN DELAROSA | 1190.91 | 40 | 3.8110 | 3.7279 |
| 2201 | ANTHONY SALVO | 1162.94 | 41 | 3.7215 | 3.8211 |
| 2188 | JUAN MARTINEZ | 1118.44 | 40 | 3.5791 | 3.7279 |
| ?148 | SEFERINO RIVERA | 1098.24 | 38 | 3.5144 | 3.5415 |
| 1428 | BLANCA OLMOS | 1091.38 | 35 | 3.4925 | 3.2619 |
| ?261 | JUAN SALINAS | 1091.25 | 40 | 3.4920 | 3.7279 |
| 2275 | CURTIS KEMMERLING | 1083.46 | 37 | 3.4671 | 3.4483 |
| 2186 | JESUS MEDRANO, JR. | 1073.28 | 35 | 3.4345 | 3.2619 |
| 0023 | JOSE ORTIZ | 1071.94 | 30 | 3.4302 | 2.7959 |
| ?243 | PEDRO MEDRANO | 1066.02 | 36 | 3.4113 | 3.3551 |
| ?185 | PEDRO BORREGO III | 1045.29 | 36 | 3.3450 | 3.3551 |
| ?192 | CARLOS PEREZ | 1016.37 | 35 | 3.2524 | 3.2619 |
| 2389 | SERGIO GRANADO | 911.53 | 40 | 2.9169 | 3.7279 |
| 0916 | VICTOR PEREZ | 852.42 | 31 | 2.7278 | 2.8891 |
| 2402 | RENATO REYES | 446.76 | 20 | 1.4296 | 1.8639 |

Average Driver Pay for 27 Drivers:   1157.39   40   3.7037   3.7279

Terminal Totals:   31249.62   1073

Coastal Transport Co., Inc.
Drivers' Pay Summary
Wed Feb 16, 2000 08:15:37.60

Harlingen Terminal

Period From: 08/16/1999 to 08/31/1999

| Driver | | Total Pay | Total Shipments | Percentage of Total Pay | Percentage of Total Shipments |
|---|---|---|---|---|---|
| 0916 | VICTOR PEREZ | 1598.94 | 58 | 4.3927 | 5.1146 |
| 1218 | ROBERTO TORRES | 1586.54 | 51 | 4.3586 | 4.4974 |
| 1976 | HENRY GONZALES | 1568.95 | 57 | 4.3103 | 5.0265 |
| 1973 | DANIEL GONZALES, JR | 1531.06 | 50 | 4.2062 | 4.4092 |
| 1839 | APOLONIO OLIVAREZ | 1510.51 | 43 | 4.1497 | 3.7919 |
| 2183 | ALBERT ANCISO | 1480.10 | 42 | 4.0662 | 3.7037 |
| 1947 | GENARO SOTO | 1442.06 | 49 | 3.9617 | 4.3210 |
| 0917 | ROSALIO PORTALES | 1429.06 | 42 | 3.9260 | 3.7037 |
| 2265 | JUAN RAMIREZ | 1428.23 | 39 | 3.9237 | 3.4392 |
| 2186 | JESUS MEDRANO, JR. | 1377.56 | 39 | 3.7845 | 3.4392 |
| 1764 | MIGUEL SOTO | 1355.87 | 42 | 3.7249 | 3.7037 |
| 0023 | JOSE ORTIZ | 1353.52 | 44 | 3.7184 | 3.8801 |
| 1428 | BLANCA OLMOS | 1276.36 | 37 | 3.5064 | 3.2628 |
| 2148 | SEFERINO RIVERA | 1266.18 | 35 | 3.4785 | 3.0864 |
| 1101 | JUAN DELAROSA | 1259.41 | 40 | 3.4599 | 3.5273 |
| 1275 | CURTIS KEMMERLING | 1251.50 | 37 | 3.4382 | 3.2628 |
| 2242 | JOSE GUERRERO | 1246.87 | 38 | 3.4254 | 3.3510 |
| 2155 | DAVID DAVILA, JR. | 1235.84 | 29 | 3.3955 | 2.5573 |
| 2261 | JUAN SALINAS | 1207.66 | 36 | 3.3177 | 3.1746 |
| 2187 | RAFAEL FENA, JR. | 1198.56 | 36 | 3.2927 | 3.1746 |
| 2389 | SERGIO GRANADO | 1185.92 | 45 | 3.2580 | 3.9683 |
| 2292 | CARLOS PEREZ | 1157.18 | 33 | 3.1790 | 2.9101 |
| 2201 | ANTHONY SALVO | 1147.27 | 38 | 3.1518 | 3.3510 |
| 2185 | PEDRO BORREGO III | 1130.65 | 36 | 3.1062 | 3.1746 |
| 2243 | PEDRO MEDRANO | 1124.24 | 37 | 3.0885 | 3.2628 |
| 2402 | RENATO REYES | 1053.99 | 46 | 2.8955 | 4.0564 |
| 2188 | JUAN MARTINEZ | 1021.80 | 28 | 2.8071 | 2.4691 |
| 2298 | JOSE CASTRO | 974.38 | 27 | 2.6768 | 2.3810 |

Average Driver Pay For 28 Drivers: 1300.01 41 3.5714 3.6155

Terminal Totals: 36400.35 1134

Coastal Transport Co., Inc.
Drivers' Pay Summary
Tue Feb 15, 2000  11:02:06.51

Harlingen Terminal

Period From: 09/01/1999 to 09/15/1999

| Driver | | Total Pay | Total Shipments | Percentage of Total Pay | Percentage of Total Shipments |
|---|---|---|---|---|---|
| 1101 | JUAN DELAROSA | 1443.89 | 42 | 4.6937 | 4.3299 |
| 2242 | JOSE GUERRERO | 1285.46 | 37 | 4.1787 | 3.8144 |
| 1839 | APOLONIO OLIVAREZ | 1275.56 | 44 | 4.1465 | 4.5361 |
| 1947 | GENARO SOTO | 1271.06 | 40 | 4.1319 | 4.1237 |
| 0023 | JOSE ORTIZ | 1262.87 | 37 | 4.1053 | 3.8144 |
| 1428 | BLANCA OLMOS | 1254.87 | 38 | 4.0792 | 3.9175 |
| 2187 | RAFAEL PENA, JR. | 1226.96 | 33 | 3.9885 | 3.4021 |
| 1218 | ROBERTO TORRES | 1210.81 | 36 | 3.9360 | 3.7113 |
| 2155 | DAVID DAVILA, JR. | 1205.62 | 30 | 3.9191 | 3.0928 |
| 0916 | VICTOR PEREZ | 1190.79 | 41 | 3.8709 | 4.2268 |
| 2298 | JOSE CASTRO | 1154.94 | 38 | 3.7544 | 3.9175 |
| 2183 | ALBERT ANCISO | 1137.44 | 38 | 3.6975 | 3.9175 |
| 2201 | ANTHONY SALVO | 1129.75 | 43 | 3.6725 | 4.4330 |
| 2265 | JUAN RAMIREZ | 1111.41 | 37 | 3.6129 | 3.8144 |
| 1973 | DANIEL GONZALES, JR | 1094.22 | 32 | 3.5570 | 3.2990 |
| 2292 | CARLOS PEREZ | 1082.27 | 36 | 3.5182 | 3.7113 |
| 2188 | JUAN MARTINEZ | 1054.23 | 33 | 3.4270 | 3.4021 |
| 2186 | JESUS MEDRANO, JR. | 1043.49 | 34 | 3.3921 | 3.5052 |
| 1764 | MIGUEL SOTO | 1036.89 | 37 | 3.3707 | 3.8144 |
| 2148 | SEFERINO RIVERA | 1030.20 | 32 | 3.3489 | 3.2990 |
| 2243 | PEDRO MEDRANO | 1021.63 | 35 | 3.3210 | 3.6082 |
| 0917 | ROSALIO PORTALES | 995.56 | 31 | 3.2363 | 3.1959 |
| 2402 | RENATO REYES | 986.07 | 28 | 3.2055 | 2.8866 |
| 2185 | PEDRO BORREGO III | 927.99 | 34 | 3.0166 | 3.5052 |
| 2261 | JUAN SALINAS | 902.56 | 28 | 2.9340 | 2.8866 |
| 2389 | SERGIO GRANADO | 874.27 | 28 | 2.8420 | 2.8866 |
| 2275 | CURTIS KEMMERLING | 834.83 | 28 | 2.7138 | 2.8866 |
| 1976 | HENRY GONZALES | 716.65 | 20 | 2.3296 | 2.0619 |

Average Driver Pay for 28 Drivers:    1098.65   35   3.5714   3.6082

Terminal Totals:    30762.29   970

Coastal Transport Co., Inc.
Drivers' Pay Summary
Tue Feb 15, 2000 11:34:32.52

Harlingen Terminal

Period From: 09/16/1999 to 09/30/1999

| Driver | | Total Pay | Total Shipments | Percentage of Total Pay | Percentage of Total Shipments |
|---|---|---|---|---|---|
| 1101 | JUAN DELAROSA | 1469.34 | 42 | 4.6759 | 4.3478 |
| 1976 | HENRY GONZALES | 1432.70 | 43 | 4.5593 | 4.4513 |
| 0916 | VICTOR PEREZ | 1430.50 | 49 | 4.5523 | 5.0725 |
| 1839 | APOLONIO OLIVAREZ | 1290.28 | 42 | 4.1061 | 4.3478 |
| 1973 | DANIEL GONZALES, JR | 1282.26 | 40 | 4.0806 | 4.1408 |
| 0023 | JOSE ORTIZ | 1279.41 | 35 | 4.0715 | 3.6232 |
| 2242 | JOSE GUERRERO | 1219.73 | 38 | 3.8816 | 3.9337 |
| 1218 | ROBERTO TORRES | 1184.48 | 36 | 3.7694 | 3.7267 |
| 2183 | ALBERT ANCISO | 1178.60 | 38 | 3.7507 | 3.9337 |
| 2148 | SEFERINO RIVERA | 1171.98 | 37 | 3.7296 | 3.8302 |
| 0917 | ROSALIO PORTALES | 1164.78 | 36 | 3.7067 | 3.7267 |
| 2201 | ANTHONY SALVO | 1161.48 | 41 | 3.6962 | 4.2443 |
| 1947 | GENARO SOTO | 1147.81 | 32 | 3.6527 | 3.3126 |
| 2185 | PEDRO BORREGO III | 1147.49 | 40 | 3.6517 | 4.1408 |
| 2155 | DAVID DAVILA, JR. | 1137.69 | 28 | 3.6205 | 2.8986 |
| 2261 | JUAN SALINAS | 1114.43 | 32 | 3.5465 | 3.3126 |
| 2187 | RAFAEL PENA, JR. | 1106.53 | 30 | 3.5213 | 3.1056 |
| 2298 | JOSE CASTRO | 1102.19 | 27 | 3.5075 | 2.7950 |
| 1428 | BLANCA OLMOS | 1075.51 | 36 | 3.4226 | 3.7267 |
| 2188 | JUAN MARTINEZ | 1009.32 | 33 | 3.2120 | 3.4161 |
| 1764 | MIGUEL SOTO | 999.16 | 36 | 3.1797 | 3.7267 |
| 2292 | CARLOS PEREZ | 993.96 | 33 | 3.1631 | 3.4161 |
| 2275 | CURTIS KEMMERLING | 978.88 | 27 | 3.1151 | 2.7950 |
| 2186 | JESUS MEDRANO, JR. | 939.44 | 26 | 2.9896 | 2.6915 |
| 2389 | SERGIO GRANADO | 920.77 | 27 | 2.9302 | 2.7950 |
| 2243 | PEDRO MEDRANO | 862.32 | 33 | 2.7442 | 3.4161 |
| 2265 | JUAN RAMIREZ | 861.57 | 27 | 2.7418 | 2.7950 |
| 2402 | RENATO REYES | 760.95 | 22 | 2.4216 | 2.2774 |
| Average Driver Pay for 28 Drivers: | | 1122.27 | 35 | 3.5714 | 3.6232 |
| Terminal Totals: | | 31423.56 | 966 | | |

CutePDF - www.texlo.com

Coastal Transport Co., Inc.
Drivers' Pay Summary
Tue Feb 15, 2000 11:58:05.58

Harlingen Terminal

Period From: 10/01/1999 to 10/15/1999

| Driver | Total Pay | Total Shipments | Percentage of Total Pay | Percentage of Total Shipments |
|---|---|---|---|---|
| 0916 VICTOR PEREZ | 1795.24 | 57 | 5.0984 | 5.5126 |
| 1976 HENRY GONZALES | 1599.54 | 52 | 4.5426 | 5.0290 |
| 1947 GENARO SOTO | 1539.09 | 42 | 4.3709 | 4.0619 |
| 2155 DAVID DAVILA, JR. | 1464.87 | 34 | 4.1601 | 3.2882 |
| 2185 PEDRO BORREGO III | 1428.37 | 48 | 4.0565 | 4.6422 |
| 2186 JESUS MEDRANO, JR. | 1392.90 | 44 | 3.9558 | 4.2553 |
| 1764 MIGUEL SOTO | 1384.42 | 43 | 3.9317 | 4.1586 |
| 1101 JUAN DELAROSA | 1379.16 | 38 | 3.9167 | 3.6750 |
| 2201 ANTHONY SALVO | 1358.83 | 29 | 3.8590 | 2.8046 |
| 2275 CURTIS KEMMERLING | 1317.65 | 43 | 3.7420 | 4.1586 |
| 2188 JUAN MARTINEZ | 1277.29 | 28 | 3.6274 | 2.7079 |
| 1839 APOLONIO OLIVAREZ | 1273.16 | 40 | 3.6157 | 3.8685 |
| 2148 SEFERINO RIVERA | 1270.85 | 40 | 3.6091 | 3.8685 |
| 1973 DANIEL GONZALES, JR | 1257.71 | 34 | 3.5718 | 3.2882 |
| 2183 ALBERT ANCISO | 1249.95 | 35 | 3.5498 | 3.3849 |
| 1218 ROBERTO TORRES | 1240.46 | 41 | 3.5228 | 3.9652 |
| 2243 PEDRO MEDRANO | 1235.12 | 37 | 3.5077 | 3.5783 |
| 2389 SERGIO GRANADO | 1221.00 | 32 | 3.4676 | 3.0948 |
| 2261 JUAN SALINAS | 1182.37 | 30 | 3.3579 | 2.9014 |
| 2402 RENATO REYES | 1174.94 | 32 | 3.3368 | 3.0948 |
| 2298 JOSE CASTRO | 1165.14 | 39 | 3.3089 | 3.7718 |
| 0917 ROSALIO PORTALES | 1151.88 | 32 | 3.2713 | 3.0948 |
| 2265 JUAN RAMIREZ | 1135.77 | 35 | 3.2255 | 3.3849 |
| 0023 JOSE ORTIZ | 1129.73 | 35 | 3.2084 | 3.3849 |
| 2242 JOSE GUERRERO | 1102.31 | 39 | 3.1305 | 3.7718 |
| 1428 BLANCA OLMOS | 1095.53 | 33 | 3.1112 | 3.1915 |
| 2292 CARLOS PEREZ | 975.67 | 32 | 2.7708 | 3.0948 |
| 2187 RAFAEL PENA, JR. | 413.04 | 10 | 1.1730 | .9671 |

Average Driver Pay for 28 Drivers:  1257.57   37   3.5714   3.5783

Terminal Totals:  35211.99   1034

Case 1:01-cv-00016   Document 18   Filed in TXSD on 07/30/2001   Page 110 of 129

Coastal Transport Co., Inc.
Drivers' Pay Summary
Tue Feb 15, 2000 13:08:01.51

Harlingen Terminal

Period From: 10/16/1999 to 10/31/1999

| Driver | | Total Pay | Total Shipments | Percentage of Total Pay | Percentage of Total Shipments |
|---|---|---|---|---|---|
| 1101 | JUAN DELAROSA | 1564.09 | 45 | 4.8434 | 4.3436 |
| 0916 | VICTOR PEREZ | 1450.74 | 49 | 4.4924 | 4.7297 |
| 2186 | JESUS MEDRANO, JR. | 1388.16 | 46 | 4.2986 | 4.4402 |
| 2265 | JUAN RAMIREZ | 1373.64 | 41 | 4.2536 | 3.9575 |
| 1973 | DANIEL GONZALES, JR | 1362.99 | 42 | 4.2207 | 4.0541 |
| 1976 | HENRY GONZALES | 1309.39 | 47 | 4.0547 | 4.5367 |
| 2188 | JUAN MARTINEZ | 1296.25 | 36 | 4.0140 | 3.4749 |
| 1839 | APOLONIO OLIVAREZ | 1286.45 | 42 | 3.9837 | 4.0541 |
| 2155 | DAVID DAVILA, JR. | 1273.27 | 41 | 3.9428 | 3.9575 |
| 2183 | ALBERT ANCISO | 1227.50 | 41 | 3.8011 | 3.9575 |
| 2298 | JOSE CASTRO | 1194.01 | 40 | 3.6974 | 3.8610 |
| 1218 | ROBERTO TORRES | 1191.28 | 40 | 3.6889 | 3.8610 |
| 0023 | JOSE ORTIZ | 1187.21 | 39 | 3.6763 | 3.7645 |
| 2201 | ANTHONY SALVO | 1183.17 | 39 | 3.6638 | 3.7645 |
| 1947 | GENARO SOTO | 1171.28 | 42 | 3.6270 | 4.0541 |
| 2389 | SERGIO GRANADO | 1162.85 | 37 | 3.6009 | 3.5714 |
| 2292 | CARLOS PEREZ | 1145.60 | 37 | 3.5475 | 3.5714 |
| 0917 | ROSALIO PORTALES | 1135.49 | 33 | 3.5162 | 3.1853 |
| 2148 | SEFERINO RIVERA | 1110.65 | 35 | 3.4393 | 3.3784 |
| 2261 | JUAN SALINAS | 1091.18 | 36 | 3.3790 | 3.4749 |
| 2402 | RENATO REYES | 1070.47 | 36 | 3.3148 | 3.4749 |
| 2185 | PEDRO BORREGO III | 1058.08 | 38 | 3.2765 | 3.6680 |
| 1428 | BLANCA OLMOS | 1052.59 | 32 | 3.2595 | 3.0888 |
| 2242 | JOSE GUERRERO | 1040.24 | 34 | 3.2212 | 3.2819 |
| 2243 | PEDRO MEDRANO | 1024.44 | 32 | 3.1723 | 3.0888 |
| 2275 | CURTIS KEMMERLING | 1007.85 | 30 | 3.1209 | 2.8958 |
| 1764 | MIGUEL SOTO | 934.37 | 26 | 2.8934 | 2.5097 |

Average Driver Pay for 27 Drivers: 1196.05 | 38 | 3.7037 | 3.6680

Terminal Totals: 32293.24 | 1036

Coastal Transport Co., Inc.
Drivers' Pay Summary
Tue Feb 15, 2000 1?:04:04.50

Harlingen Terminal

Period From: 11/01/1999 to 11/15/1999

| Driver | | Total Pay | Total Shipments | Percentage of Total Pay | Percentage of Total Shipments |
|---|---|---|---|---|---|
| 1764 | MIGUEL SOTO | 1392.81 | 48 | 4.7930 | 5.1948 |
| 1428 | BLANCA OLMOS | 1278.05 | 38 | 4.3981 | 4.1126 |
| 1973 | DANIEL GONZALES, JR | 1225.51 | 34 | 4.2173 | 3.6797 |
| 0916 | VICTOR PEREZ | 1223.01 | 41 | 4.2087 | 4.4372 |
| 2265 | JUAN RAMIREZ | 1182.30 | 37 | 4.0686 | 4.0043 |
| 1101 | JUAN DELAROSA | 1154.83 | 36 | 3.9741 | 3.8961 |
| 0023 | JOSE ORTIZ | 1144.73 | 33 | 3.9393 | 3.5714 |
| 2201 | ANTHONY SALVO | 1136.66 | 43 | 3.9115 | 4.6537 |
| 1839 | APOLONIO OLIVAREZ | 1130.63 | 36 | 3.8908 | 3.8961 |
| 0917 | ROSALIO PORTALES | 1100.30 | 28 | 3.7864 | 3.0303 |
| 1218 | ROBERTO TORRES | 1098.29 | 35 | 3.7795 | 3.7879 |
| 2261 | JUAN SALINAS | 1080.96 | 35 | 3.7199 | 3.7879 |
| 2183 | ALBERT ANCISO | 1077.56 | 33 | 3.7082 | 3.5714 |
| 2188 | JUAN MARTINEZ | 1070.74 | 35 | 3.6847 | 3.7879 |
| 2243 | PEDRO MEDRANO | 1061.37 | 35 | 3.6525 | 3.7879 |
| 2275 | CURTIS KEMMERLING | 1047.36 | 33 | 3.6042 | 3.5714 |
| 1947 | GENARO SOTO | 1046.76 | 33 | 3.6022 | 3.5714 |
| 1976 | HENRY GONZALES | 1036.45 | 33 | 3.5667 | 3.5714 |
| 2185 | PEDRO BORREGO III | 1031.35 | 36 | 3.5492 | 3.8961 |
| 2148 | SEFERINO RIVERA | 1011.17 | 32 | 3.4797 | 3.4632 |
| 2242 | JOSE GUERRERO | 1002.22 | 30 | 3.4489 | 3.2468 |
| 2298 | JOSE CASTRO | 998.30 | 32 | 3.4354 | 3.4632 |
| 1389 | SERGIO GRANADO | 976.18 | 31 | 3.3593 | 3.3550 |
| 2186 | JESUS MEDRANO, JR. | 972.56 | 31 | 3.3468 | 3.3550 |
| 2292 | CARLOS PEREZ | 876.86 | 29 | 3.0175 | 3.1385 |
| 2402 | RENATO REYES | 871.08 | 29 | 2.9976 | 3.1385 |
| 2155 | DAVID DAVILA, JR. | 831.03 | 28 | 2.8598 | 3.0303 |

Average Driver Pay for  27 Drivers:   1076.26   34   3.7037   3.6797

Terminal Totals:                       29059.07   924

Coastal Transport Co., Inc.
Drivers' Pay Summary
Tue Feb 15, 2000 19:24:37.53

Harlingen Terminal

Period From: 11/16/1999 to 11/30/1999

| Driver | | Total Pay | Total Shipments | Percentage of Total Pay | Percentage of Total Shipments |
|---|---|---|---|---|---|
| 1839 | APOLONIO OLIVAREZ | 1301.36 | 44 | 4.9057 | 4.9217 |
| 0916 | VICTOR PEREZ | 1291.62 | 45 | 4.8690 | 5.0336 |
| 1947 | GENARO SOTO | 1286.90 | 44 | 4.8512 | 4.9217 |
| 1976 | HENRY GONZALES | 1263.10 | 41 | 4.7615 | 4.5861 |
| 3242 | JOSE GUERRERO | 1153.77 | 40 | 4.3493 | 4.4743 |
| 2265 | JUAN RAMIREZ | 1077.05 | 34 | 4.0601 | 3.8031 |
| 1973 | DANIEL GONZALES, JR | 1063.63 | 33 | 4.0095 | 3.6913 |
| 1428 | BLANCA OLMOS | 1052.31 | 37 | 3.9669 | 4.1387 |
| 1218 | ROBERTO TORRES | 1039.06 | 35 | 3.9169 | 3.9150 |
| 2155 | DAVID DAVILA, JR. | 1037.59 | 34 | 3.9114 | 3.8031 |
| 2389 | SERGIO GRANADO | 1034.59 | 33 | 3.9001 | 3.6913 |
| 2148 | SEFERINO RIVERA | 1006.67 | 34 | 3.7948 | 3.8031 |
| 2261 | JUAN SALINAS | 995.61 | 34 | 3.7531 | 3.8031 |
| 2183 | ALBERT ANCISO | 964.89 | 33 | 3.6373 | 3.6913 |
| 2186 | JESUS MEDRANO, JR. | 963.30 | 32 | 3.6313 | 3.5794 |
| 2201 | ANTHONY SALVO | 956.00 | 36 | 3.6038 | 4.0268 |
| 0917 | ROSALIO PORTALES | 923.94 | 28 | 3.4830 | 3.1320 |
| 2275 | CURTIS KEMMERLING | 923.46 | 32 | 3.4812 | 3.5794 |
| 2188 | JUAN MARTINEZ | 914.63 | 31 | 3.4479 | 3.4676 |
| 2292 | CARLOS PEREZ | 905.54 | 30 | 3.4136 | 3.3557 |
| 2402 | RENATO REYES | 877.91 | 29 | 3.3094 | 3.2438 |
| 2298 | JOSE CASTRO | 862.57 | 28 | 3.2516 | 3.1320 |
| 2243 | PEDRO MEDRANO | 786.14 | 28 | 2.9635 | 3.1320 |
| 2185 | PEDRO BORREGO III | 774.15 | 29 | 2.9183 | 3.2438 |
| 0023 | JOSE ORTIZ | 727.98 | 24 | 2.7443 | 2.6846 |
| 1101 | JUAN DELAROSA | 718.12 | 23 | 2.7071 | 2.5727 |
| 1764 | MIGUEL SOTO | 625.54 | 23 | 2.3581 | 2.5727 |

Average Driver Pay for 27 Drivers:  982.50   33   3.7037   3.6913

Terminal Totals:  26527.43   894

Case 1:01-cv-00016   Document 18   Filed in TXSD on 07/30/2001   Page 113 of 129

Coastal Transport Co., Inc.
Drivers' Pay Summary
Tue Feb 15, 2000 17:41:50.51

Harlingen Terminal

Period From: 12/01/1999 to 12/15/1999

| Driver | | Total Pay | Total Shipments | Percentage of Total Pay | Percentage of Total Shipments |
|--------|--|-----------|-----------------|-------------------------|-------------------------------|
| 1839 | APOLONIO OLIVAREZ | 1358.06 | 41 | 4.5347 | 4.0675 |
| 2201 | ANTHONY SALVO | 1318.12 | 48 | 4.4014 | 4.7619 |
| 1101 | JUAN DELAROSA | 1280.74 | 37 | 4.2766 | 3.6706 |
| 0917 | ROSALIO PORTALES | 1274.97 | 36 | 4.2573 | 3.5714 |
| 2155 | DAVID DAVILA, JR. | 1263.75 | 46 | 4.2198 | 4.5635 |
| 1764 | MIGUEL SOTO | 1262.81 | 45 | 4.2167 | 4.4643 |
| 1976 | HENRY GONZALES | 1250.23 | 33 | 4.1747 | 3.2738 |
| 0916 | VICTOR PEREZ | 1232.47 | 45 | 4.1154 | 4.4643 |
| 2183 | ALBERT ANGISO | 1210.27 | 36 | 4.0412 | 3.5714 |
| 2186 | JESUS MEDRANO, JR. | 1169.97 | 46 | 3.9067 | 4.5635 |
| 2389 | SERGIO GRANADO | 1158.94 | 41 | 3.8698 | 4.0675 |
| 0923 | JOSE ORTIZ | 1136.47 | 34 | 3.7948 | 3.3730 |
| 2261 | JUAN SALINAS | 1136.04 | 43 | 3.7934 | 4.2659 |
| 1947 | GENARO SOTO | 1099.13 | 40 | 3.6701 | 3.9683 |
| 2242 | JOSE GUERRERO | 1074.51 | 33 | 3.5879 | 3.2738 |
| 2265 | JUAN RAMIREZ | 1044.85 | 33 | 3.4889 | 3.2738 |
| 1973 | DANIEL GONZALES, JR | 1044.13 | 34 | 3.4865 | 3.3730 |
| 2298 | JOSE CASTRO | 1040.08 | 38 | 3.4730 | 3.7698 |
| 2185 | PEDRO BORREGO III | 1033.26 | 40 | 3.4502 | 3.9683 |
| 2148 | SEFERINO RIVERA | 1020.37 | 39 | 3.4071 | 3.8690 |
| 2243 | PEDRO MEDRANO | 1014.79 | 34 | 3.3885 | 3.3730 |
| 2275 | CURTIS KEMMERLING | 991.06 | 38 | 3.3093 | 3.7698 |
| 2292 | CARLOS PEREZ | 950.80 | 35 | 3.1748 | 3.4722 |
| 2188 | JUAN MARTINEZ | 927.57 | 33 | 3.0973 | 3.2738 |
| 1218 | ROBERTO TORRES | 908.19 | 28 | 3.0326 | 2.7778 |
| 1428 | BLANCA OLMOS | 891.68 | 26 | 2.9774 | 2.5794 |
| 2196 | EFRAIN CARMONA | 683.61 | 20 | 2.2823 | 1.9841 |
| 2402 | RENATO REYES | 171.18 | 6 | .5716 | .5952 |

| Average Driver Pay for 28 Drivers: | 1069.57 | 36 | 3.5714 | 3.5714 |
|---|---|---|---|---|
| Terminal Totals: | 29947.95 | 1008 | | |

Coastal Transport Co., Inc.
Drivers' Pay Summary
Tue Feb 15, 2000 19:59:24.53

Harlingen Terminal

Period From: 12/16/1999 to 12/31/1999

| Driver | | Total Pay | Total Shipments | Percentage of Total Pay | Percentage of Total Shipments |
|---|---|---|---|---|---|
| 2201 | ANTHONY SALVO | 1607.62 | 61 | 5.2284 | 5.7493 |
| 1839 | APOLONIO OLIVAREZ | 1535.74 | 49 | 4.9946 | 4.6183 |
| 1976 | HENRY GONZALES | 1533.17 | 52 | 4.9863 | 4.9010 |
| 1218 | ROBERTO TORRES | 1518.18 | 48 | 4.9375 | 4.5240 |
| 1101 | JUAN DELAROSA | 1402.88 | 43 | 4.5625 | 4.0528 |
| 2265 | JUAN RAMIREZ | 1399.96 | 44 | 4.5530 | 4.1470 |
| 1428 | BLANCA OLMOS | 1390.97 | 47 | 4.5238 | 4.4298 |
| 1947 | GENARO SOTO | 1381.03 | 51 | 4.4915 | 4.8068 |
| 2242 | JOSE GUERRERO | 1339.97 | 47 | 4.3579 | 4.4298 |
| 2298 | JOSE CASTRO | 1299.81 | 46 | 4.2273 | 4.3355 |
| 1764 | MIGUEL SOTO | 1275.29 | 43 | 4.1476 | 4.0528 |
| 2185 | PEDRO BORREGO III | 1274.78 | 48 | 4.1459 | 4.5240 |
| 2148 | SEFERINO RIVERA | 1251.28 | 39 | 4.0695 | 3.6758 |
| 2183 | ALBERT ANCISO | 1202.42 | 42 | 3.9106 | 3.9585 |
| 2243 | PEDRO MEDRANO | 1151.53 | 40 | 3.7451 | 3.7700 |
| 0917 | ROSALIO PORTALES | 1144.20 | 39 | 3.7212 | 3.6758 |
| 2389 | SERGIO GRANADO | 1126.63 | 41 | 3.6641 | 3.8643 |
| 2155 | DAVID DAVILA, JR. | 1122.58 | 40 | 3.6509 | 3.7700 |
| 2275 | CURTIS KEMMERLING | 1089.21 | 40 | 3.5424 | 3.7700 |
| 2292 | CARLOS PEREZ | 1082.48 | 39 | 3.5205 | 3.6758 |
| 2186 | JESUS MEDRANO, JR. | 1073.40 | 37 | 3.4910 | 3.4873 |
| 2188 | JUAN MARTINEZ | 1049.81 | 38 | 3.4143 | 3.5815 |
| 2261 | JUAN SALINAS | 988.69 | 37 | 3.2155 | 3.4873 |
| 1973 | DANIEL GONZALES, JR | 938.18 | 31 | 3.0512 | 2.9218 |
| 0916 | VICTOR PEREZ | 357.32 | 13 | 1.1621 | 1.2253 |
| 0023 | JOSE ORTIZ | 210.72 | 6 | .6853 | .5655 |

Average Driver Pay for 26 Drivers: 1182.61   41   3.8462   3.8643

Terminal Totals: 30747.85   1061

02/14/00   MON 13:20 FAX 210 002 8712        COASTAL TRANSPORT                    002
02/11/00   11:23  FAX 956 423 3441            COASTAL TRANSPOR                    02

| CHARGE OF DISCRIMINATION | | AGENCY | CHARGE NUMBER |
|---|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | | ☐ FEPA  ☒ EEOC | 360A00539 |

Texas Commission on Human Rights _____ and EEOC
                    *State or local Agency, if any*

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Ms. Blanca Olmos | (956) 350-3680 |

| STREET ADDRESS               CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|
| 4008 N Expressway #19, Brownsville, TX 78520 | 05/30/1963 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below).

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Coastal Transport | Cat B (101-200) | |

| STREET ADDRESS          CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| 308 N. Expressway, Harlingen, TX 78550 | 061 |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS          CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| | |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN  ☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER (Specify) | EARLIEST          LATEST  05/27/1999      05/17/1999  ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

On May 27, 1999, I was terminated from my position due to an accident, which was not due to any negligence on my part. After the company learned that I alleged to the police department that I was terminated because of my gender, I was rehired by the company. Upon my rehire, Mr. Garza has retaliated against me in the following manner: he has assigned to me the worst tankers to drive; not given me proper fittings that I can unload; not given me a truck with a pump; cut my work schedule and amount of work; and not paid me the non-revenues and demurrage. His actions have resulted in me losing about $300.00 per month.

I believe that I have been discriminated against because of my sex, female, and because I opposed discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended.



Olmos
EXHIBIT NO. 7
3-22-0
BRYANT & STINGLEY, INC.

| ☐ I want this charge filed with both the EEOC and the state or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (when necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| Date 12-23-99      Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day and year) |

EEOC FORM 5 (REV. 06/83)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| | ☒ FEPA | 1A/0126-S |
| RECEIVED | ☐ EEOC | 31CA10165 |

Texas Commission On Human Rights
*State or local Agency, if any*   and EEOC

RECEIVED
NOV 15 2000

TX COMMISSION OF
HUMAN RIGHTS

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Ms. Blanca Olmos | (956) 350-3680 |
| STREET ADDRESS          CITY, STATE AND ZIP CODE | DATE OF BIRTH |
| 4008 N. Exprwy 19, Brownsville, TX 78520 | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Coastal Transport | Cat B (101-200) | (800) 377-4105 |
| STREET ADDRESS          CITY, STATE AND ZIP CODE | | COUNTY |
| 308 N. Expressway, Harlingen, TX 78550 | | 061 |
| NAME | | TELEPHONE NUMBER (Include Area Code) |
| | | |
| STREET ADDRESS          CITY, STATE AND ZIP CODE | | COUNTY |
| | | |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN | EARLIEST          LATEST |
| ☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify) | 12/17/1999   12/17/1999 |
| | ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

Date rceived May 8, 2000.

I.       Personal Harm:

1.  I was terminated from my position as Truck Driver.

2.  Through out my employment, I was subjected to sexual harassment by my Supervisor, Mr. Manuel Loya.

II.      Respondent's Reason For Adverse Action:

1.  I was advised that I was being terminated because of a gas spill.

2.  No reason.

III.     Discrimination Statement:

I believe that I have been discriminated against, in violation of the Texas Commission on Human Rights Act, as amended, and Title VII of the Civil Rights Act of 1964, as amended, because of my sex, female and (Sexual Harassment), inasmuch as:

1.  I was subjected to unwelcomed sexual comments by Mr. Manuel Loya. For example,

** Text is Continued on Attached Sheet(s) **

Olmos

EXHIBIT NO. 8
3-22-01
BRYANT & STINGLEY, INC.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | State of Texas - Cameron County |
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| | X |
| X 11/3/00   X _____ | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE |
| Date          Charging Party (Signature) | (Month, day and year) |
| | 11-13-00 |
| EEOC FORM 5 (Rev. 07/98) | |

Oct 31 12:14 2000   CP Initials $\times$ B.E.O.   Chg # , Attachment Page 1

------------------------------------------------------------------------

Equal Employment Opportunity Commission
Form 5 – Charge of Discrimination, Additional Text

------------------------------------------------------------------------


A. Mr. Manuel Loya forced a kiss on me against my will.

C. He also told me I could choose my load assignments if I would "give into" him.

D. He referred to me as, "Mamacita" and would phone me at home on my days off.

2. Mr. Garza did not file any incident reports when a driver Mr. Victor Perez made two spills in one month. Mr. Perry did not get a write up suspension, termination or withholding of pay.  Perez

_____        $\times$ 11-13-00
Charging Party              Date

                          $\times$ 11-13-00
Notary Public              Date


ESTHELA D. GUERRA
Notary Public, State of Texas
My Commission Expires
04-__-2001

On September 1, 1996 I was hired for Coastal Transport. I have a Class A, CDL License. My occupation is a truck driver, transporting hazardous materials.

Approximately May or June of 1997, the company hired another female truck driver. Her name is Linda Garcia. Soon after Linda was employed, I was at the driver's room waiting for instructions on the next load, when I over heard my manager (Manuel Garza) and my assistant manager (Manuel Loya) saying something about Linda. I heard Manuel Garza say to Manuel Loya "Linda esta muy buena." I ignored it and went outside to pre-trip my truck. About a month later after this, I saw my manager bothering Linda. As I walked in the office, my manager was trying to kiss her. I remember it was on a Sunday around 7 p.m. When Mr. Garza saw me he was shocked and he said, "Yo pensaba que ya se abian ido para la casa." Linda looked upset and she took off in her car. I then used the phone to call my house, and I went home.

I didn't see Linda for the following days; however, I did bump into Robert Torres (her boy friend). He told me "se sa le el pinche puto de Garza!" "Le tuve que ira brincar a la officina," Mr. Torres also said to me that Mr. Garza told him that "la ocupe para mi!, No para que si fijara enti!" Everybody knew Robert Torres and Linda were dating.

A few months later the assistant manager, Mr. Loya, Robert Torres, Linda, and I were at the office. At this time, Robert Torres's wife honked from the car and Robert went outside to talk to his wife while Linda waited in the mechanics room for him. Mr. Loya walked to the window and looked through the venetian blinds to peep outside. He then told me, "hey chaparra, yo quisiera andar contigo como Linda y Robert. " I screamed to him, "estas loco!" Then I took off to my home. As the weeks passed by, I noticed my assistant manager, Mr. Loya, would start to bother me to help with the paper work at the office, especially on Sundays, while I waited for the next load. No one was at the office. He told me to help him at the office because he said he needed help, and his excuse is that I didn't have a load at that time. He also said there were no loads. Everyone left to work, and I was the only left standing around.

I noticed he gave everybody loads and he didn't give me a load; therefore, I waited for a load longer than usual. Then he would say, "help me with the paper work mamacita." I would tell him, "ya apaciguate! si quieres que te ayude con los papeles ya damelos para hacertelos!", and sometimes I would tell him "ya dejame de decir eso!" I felt uncomfortable because that was not my job; however, I did start to help him because he would tell me that "any way you are still getting paid for four hours." After the four hours lapsed, I would go home. I helped him on 2 or 3 Sundays. Neither on these Sunday days was anybody around. On the third Sunday, he forced a kiss on me and he hugged me. I pushed him away and I was very upset. He started saying, "I am sorry!" "I am sorry!" I just took off to my house feeling embarrassed and upset.

EXHIBIT NO.
3-23-01

A month later the company had a safety meeting. At the meeting Linda said that she needed someone from the top to come to the terminal "so we can talk personal things." I noticed no one was listening to Linda. Then I got up and stood in front of the assistant manager and the safety director and I questioned "That if it was right and correct because my assistant manager who is right here, to choose my loads or do I have to go out with him?" "Or to get good loads or bad loads?" Mr. Loya was shocked and embarrassed. The safety director ( David Walche) said to me that he "couldn't do anything because he was just the safety director, but that he would report it to San Antonio," and the meeting adjourned.

Mr. Loya approached me on many occasions where he would show me the load slips and say, "hey chaparra, aqui tengo estos loads, a cual quieres?" I answered him many times, "Dame el que sea, I came to work, not to choose loads!" Then he looked over the loads and tells the dispatcher, "give this load to the chaparra." I would do the load he assigned me.

After each load, I have to report in through the CB. Mr. Loya then many times told me, "hey chaparra, call me by phone because I can't tell you through the CB." So I would call him to see what he wanted. I would answer, "que paso!" He would always start his words like "que paso mamacita, entonces que, entonces cuando?" So I answered him, "Do you have the load?" "Deja de estar perdiendome mi tiempo!" He answered "no te enojes," "no le digas a nadie." And he would give me the load and I answered "bueno, bye." This went on and on every day. Usually he would wait for me to get to the yard and was waiting for any chance to see me. One time while I was alone at the yard checking my dispatch for the next day, Mr. Loya came into the office all drunk. He startled me and he started again to bother me, telling me in these words, "Tu sabes que, yo quiero salir contigo." I responded, "Tu eres mi patron, y no mas! Entiendelo! No mas eres mi patron!" He then followed me to my car and I got in my vehicle and I took off. He just stood there.

Many times, Mr. Loya would touch me and I many times pushed him away. Every one of the drivers saw how he bothered me. If I was sitting in a chair, he would come from behind the chair and put his leg over my back and I would quickly get up and I would tell him "Chingado! No me dejas en pas!" Some drivers would see and they would tell him "dejala! No te va hacer caso." He would then back off with a cynical smile. Many times while I was standing waiting for a load, Mr. Loya would come from the back and put his arms around my hip, shoulders, and pinch my side with his hands. I pushed him away many times using my whole arm and elbow. I have said to him, "quitate de aqui sonso!" "Estas casado, quitate de aqui!" "Muy apenas puedes a mantener a tu vieja!" "Que me vas a mantener a mi!" One time I asked him, "Que tu vieja no te da?" There wasn't a day that went by that he wouldn't leave me alone.

out." I thought to myself, I knew it was gasoline in my ear and he wants me to use a cigarette lighter to my ear? Does he want me to blow up? This was an endangerment to my life. He totally ignored me saying it was nothing. From the yard, I left to the San Benito clinic to see a doctor. The San Benito clinic had already closed. It was around after 6:30 p.m. so then I went home to change and called my mom to tell her the problem and that I wanted to go see a doctor. She took me to go see a doctor in Matamoros, Mexico. I saw a Dr. Lucio Guerra Farias. He checked my right ear and my eye and he said I had lost my hearing to my ear. I still had no change to my ear. I went for a follow up visit for which Mr. Garza was notified because I missed a few days of work. I got a letter from the doctor stating my diagnosis. He recommended I see another doctor in the United States since I was insured. The doctor also stated to me that not even an operation would save my hearing. A month after the accident I went to go see my doctor (Dr. Edward Atkinson) in San Benito, Texas. Dr. Atkinson examined my ear and my eye. His diagnosis was that I was not able to hear with my right ear, and that I had swelling to my eye. He stated to me that the swelling would eventually go away. He also recommended that I see a specialist. His office made the appointment with Dr. Arredondo. Dr. Atkinson also told me to go to Workers Comp located in the same building. A lady worker from Workers Comp called Mr. Garza at the yard. Evelia Garza and I saw them talking through the glass on the phone. I was later informed that Mr. Garza had denied any knowledge of my accident of the spill about a month earlier. Since I needed medical attention, my private insurance took care of the office visit. This insurance I got from outside the company. The diagnosis of Dr. Arredondo was that I had lost my hearing and not even with an operation would I hear. So I asked him for another opinion, and he sent me to Dr. Pedro Montano, a plastic surgeon. Dr. Montano gave me hope of having a fifty/fifty chance of hearing again. I was desperate, so I underwent surgery. Before the surgery, I gave all the papers to Mr. Garza so he could put them through the company insurance. Mr. Garza never reported the spill upstate, never contacted anybody, and my private insurance ended up paying for everything. The result of the surgery was unsuccessful. Dr. Montano recommended a hearing aide. I'm still not able to hear with my right ear with the use of the hearing aide. I was out for medical leave for 3 months.

Upon returning to work, Coastal sent me for a physical examination with the company's doctor (Dr. Folsman) located in Harlingen, Texas. His examination consisted of checking both my eyes and listening to my chest front and back and only saw my hearing aide and checked my blood for the sugar, and I also urinated in a cup for drug use. He did not take my blood pressure. He told me "you are ready to go back to work, go to the front desk, they can give you your D.O.T. medical card." I got my medial card and I reported to work. Upon arrival in the yard, I

noticed Linda wasn't scheduled for work. I didn't see Linda anymore. Everyone was saying that Linda was forced to resign. Mr. Garza told me that I was going to have 3 days re-training, and that I wasn't going to have my issued truck or tank. After the training, Mr. Garza assigned me different trucks and different compartment sizes. The trucks he assigned me to use had no equipment at all times. I had no choice but to get equipment from other tankers. When he discovered I was using the equipment, he got extremely angry and screamed to me on many occasions about the equipment. I told him many times even in writing about equipment. I told him "I need to do my job!" I once was forced to had to call at his home to inquire about my equipment. The next day he was enraged and screamed to me in front the dispatchers (Ruben and Mr. Loya.) I resorted to call the San Antonio office. They spoke to him, but still, he didn't listen. Things went to the worst. He also told me several times, "if you don't like it, there is the door." I kept working in those conditions. He also screamed to me many times saying "you cannot hear right! You don't listen to me!" He repeated those words so many times that I got a headache every day. Mr. Garza also assigned me loads that were longer than the hours I had to work. I remember one load he assigned me while I was at Brownsville. He said to load it and take it to Hidalgo, Texas. I only had 2 hours for my shift to finish and it requires 30 min to load the, 1 hour 20 min to get there, 45 min to unload, and 45 minutes to get back to the yard of Harlingen. I told him over the CB, I had only 2 hours of my shift to be over and also told him I was not going to do it. He got very upset and started screaming at me over the CB because I didn't listen to him. I still loaded and took the load to the yard. I arrived at the terminal and grabbed my logbook and went to the office to talk to him. I told him, "Garza, aqui traigo el viaje, no tengo muchas horas, aqui esta mi loge para que lo mires!" "No tengo muchas horas, send somebody else." His voice elevated and he yelled at me and said, "necesito el viaje!" I responded, "pues no le voy hacerlo porque no debo hacerlo, enojate si queres! Es tu problema!" He also told me "fix the log." He answered me, "nomas te voy a pagar dos dolares por el viaje aqui!" I responded, "pagame lo que quieras." Then I finished my paperwork and went home. To this day he has not paid me my two dollars. I am not going to jeopardize my job. I know that the D.O.T. can stop me and cancel my license. Then Jacob (the dispatcher) told me, "dice Garza que esta celebrando porque Linda ya no esta aqui." I also saw almost everyone of my co. workers gathered in the mechanics room eating (around 6-7 p.m.) I left him the truck and went home.

On May 27, 1999 I did a load at Circle K #97 located at Central Blvd. and Boca Chica in Brownsville, Texas. Right after connecting the hoses, I heard pressurized air coming out of the underground tank. I realized the underground tank was having a vent problem. I quickly went to the store and reported it to the cashier and then I reported it to the dispatcher (who was Mr.

Garza.) Mr. Garza suggested to me that I needed to take the clerk outside so I could explain the situation to him. Garza also instructed me to put a 2-inch hose and drop it into the underground tank. Then I took the clerk outside with me. As I explained to the clerk, a fire inspector was by the light at the intersection and he saw us and he came directly to us. His name is Steve Gateway. He asked, "what's wrong." So I explained to him that the relief valve was not functioning correctly of the underground tank. He asked why I was using a 2-inch hose. I answered "because my boss just told me to do it because he said that it was the only way to unload the tank." The inspector then opened the valve and the gas suddenly spilled. He immediately closed the valve. He told me that he would take care of it. I went inside the store and called dispatch again. This time Epiphanio answered the call and he said that Mr. Garza had left the office. I communicated everything to Epiphanio about the spill. Epiphanio gave me direct orders to take the load to another Circle K on Los Ebanos across the Post Office, and that load was going to be my last load. I felt Garza was irresponsable and that he should have waited at the office knowing I had just called about a problem. The next day after my shift was over, Garza was waiting for me and approached me to ask me if I had finished the paper work. He told me he wanted to speak to me at his office. After finishing my paper work, I went to his office and he notified me I was terminated from my job. I asked him "why." He answered me "because of the spill, because of lack of communication, and because you are asking for equipment." I asked him, "no te dijo Epiphanio del spill?" Then I walked to the next office to call Epiphanio because he was my witness that I did report to Epiphanio about the spill. I confronted Epiphanio in front of Mr. Garza and I asked him, "didn't I communicate to you about the spill?" Epiphanio answered "yes, she did." I asked him, "didn't you also instruct me to unload the load at the Circle K at Los Ebanos?" He answered, "yes." After Garza talked to me, Epiphanio stated "Garza se hace que no le dije del spill." After this, I didn't know what to do, so then I decided to call the Texas Department of Transportation to come to the terminal to make a report of my termination. They came and made the report of my complaint of my truck and the tanks condition that I was driving. I showed them that I didn't have proper equipment to work, their excuse of my termination of the spill, and their claim of communication on my part. Every truck I drove did not have the D.O.T. registration papers in it. Then the following day, I went to the Texas Employment Commission in search for another job. I told them about my problem, why I was no longer employed, and I showed them proof of my termination. A week later I received a certified letter that I had my job back. When I went back to work, Mr. Garza told me I had lost my bonuses, knowing when the company didn't spend no money on the spill, I also lost my pay rate, half of my vacations, and my seniority. He was not paying me the non-revenues which is supposed to be three hundred dollars a month. He

also told me he was going to give me the same unequipped trucks over and over. My work load schedule changed, and my hours shortened, and my pay dropped dramatically from two hundred and twenty five dollars a day to one hundred dollars a day. He was still not respecting me and was giving me a tough time. Every time I reported anything to the dispatcher, he would get the CB and make a ugly remark to put me down, wanting to be correct no matter how wrong he was. Both Mr. Garza and Mr. Loya continued to have me standing around the office. Everyone else got loads and had me there in his office just waiting. He gave me excuses like "there are no loads." At this time my paycheck did not include the hours I was standing around in the office waiting for loads. By law I understand I am supposed to get paid eight dollars per hour while waiting for loads. I complained to him about this on every pay period. Every time I complained he said, "In the next pay period, you will get paid." When the pay period came, my paycheck did not include the due money. This went on for months. Things at work have been like this since I returned to work.

On May 6, 2000, at Tex Mart #15 in San Benito, Texas of this year, I suffered another accident. It happened as I was finishing unloading. I saw that there was no fuel coming out so I started to disconnect the hoses and the underground tank burped. The gasoline splashed on my face, both eyes, entered my nose, and my left breast. I fell to the ground and I couldn't catch my breath. I was unable to breathe, and I was trying to gasp for air. I couldn't see or open my eyes. All of the sudden I heard a man's voice say "do you want me to call anybody?" I couldn't answer him. With a lot of difficulty I pointed to the truck with my arms and I tried to tell him to get me the water inside the truck. No voice came out of me. All of a sudden, I felt water being splashed on my face. I felt the water giving me oxygen into my lungs. I could only open my eyes a little bit. Then the man left to go call 911. I began to vomit. The ambulance came and I continued vomiting. The ambulance took me to the Dolly Vincent Hospital. The doctor on duty called my doctor. They showered me many times at the hospital, and they took chest x-rays. I was having a loud breathing noise. I still was having difficulty catching my breath. At three in the morning, I woke up with a big headache and I was vomiting more. My eyes were swollen, and I felt a burning sensation in my eyes and my left breast. I could smell the fumes of gasoline on me. When they brought me my food at the hospital, I vomited whatever I ate. I even vomited water or any liquids. I felt the food was returning from my throat. As soon as I swallowed, it came right back up immediately. The nurses knew that I was having difficulty eating or drinking. The doctor said I could go home and to see him back in his office. To this day, I have not been released yet because I am still having swelling around my eyes, bright sunlight bothers me a lot, and I have a pain in my left breast. I am still having pain in my throat and my voice changes a

lot. From what I understand from the Coastal Contract, its says that we can only work with Coastal, we cannot have another part time job on the side. As of recently, Mr. Garza has bought a semi. He has the semi working and the driver calls him on the company's phone. I think it's distracting along with breaking the contract rules. I think that Garza and Loya never pay attention at work because they always spend time harassing women.

I am enclosing the outline requested by TCHR.

I, Blanca Olmos, was employed on September 2, 1996 for Coastal Transport. I worked there for 4 years. I have a commercial driver's license and a Tank Vehicle and Hazardous Material license. My job title is to be a truck driver. I was discriminated in my job and gender. In addition, I also experienced negligence, retaliation, endangerment to my life, and sexual harassment.

1. The following is a description of how I feel I was sexually Harassment by Mr. Manuel Loya, Assistant Manager with Coastal Transport Company Inc., at 802 N. Expressway 77 Harlingen, TX. 78550. My witnesses who saw Mr. Manuel Loya bother me are: Joe Ortiz, Robert Torres, Linda Garcia, and Freddy Perez who are truck drivers for Coastal Transport Company Inc.

    A.  Joe Ortiz driver, Coastal Transport Inc.
                      802 N. Expressway 77
                      Harlingen, TX 78550
                      Work-1-800-372-4105

    B.  Robert Torres driver, Coastal Transport Co. Inc.
                      802 N. Expressway 77
                      Harlingen, TX 78550
                      Work-1-800-372-4105

    C. Linda Garcia, driver  Mission Petroleum Inc.
      Work - 1710 Amistad      HOME- RT. 6 Box 473
         San Benito, TX 78586      San Benito, TX 78539
         Work- 1-800-737-9975     Home- (956) 399-1506

    D. Freddy Perez, driver for PETROCHEM TRANSPORTS INC.
                    1317 North FM 509
                    Harlingen, TX. 78550
                    (956) 364-0186

    E. Carma Torres, driver for Mission Petroleum Inc.
                    1710 Amistad
                    San Benito, TX 78586  1-800-737-9975



Olmos

EXHIBIT NO.
3 -23-0
BRYANT & STINGLEY,

2. From March 1997, Mr. Manual Loya started to bother me
continuously up to when I suffered the third incident May 6,2000.
In spring of 1997, one day after I finished my paper work paper work,
Mr. Manual Loya said to me "Are you staying over for the BBQ?"  I
answered  "no", He said " the BBQ is for you " I told him "estas loco
ya me voy!"   Invited people were Linda Garcia, Robert Torres, and
Freddy Perez.


3. There was one particular Sunday when Mr. Loya showed up
DRUNK at the yard. It was around 7:30pm. The office was closed and
I was at the driver's room having just finished my paper work. I turned
and I saw Mr. Loya and I asked him "que haces aqui?" He said "
Vamos a salir." "Orita" I told Him, "estas loco" and I left.


4. One week day, Robert Torres, Linda Garcia,Manual loya and I
were at the drivers room  Torres 's wife honked  and he went to her car
Linda to the  mechanics room.  Mr. Loya then got upu to see through
the venetian blinds and said to me "hey chapparra quisiera andar
contigo como Linda y Robert". I told Him "estas loco" and left the
room
    A.  Linda Garcia, truck driver, MISSION PETROLUEM
                Rt. 6 Box 473
                San Benito, TX 78539
                (956) 399-1506 home

    B.  Robert Torres, truck driver  Coastal Transport Co. Inc.
                802 N. Expressway Hwy. 77
                Harlingen, TX 78550
                1-800-372-4105

    C.  Mr. Manual Loya, assistant manager for Coastal Transport Co.
Inc.
                802 N. Expressway Hwy. 77
                Harlingen, TX 78550

3-9

5. On Sundays there was no dispatcher so Mr. Loya would be the dispatcher. He would try to flatter me by saying "choose the load you want" and showed the loads slips to me. I told him "Just give me any Load! I came to work! Not to choose my load!" Every time he was on duty as dispatcher he would tell me to call him on the phone for more instructions. On the phone he would to start to give me the instructions, while looking over the load slips he would make conversation like "mamacita entonces cuando, al cabo te recojo" I told him many times "just give me the load!" I also told him "Deja de ester perdiendo me tiempo" He would say "NO te enojes " and added to say "no le digas a nadie".

6. Mr. Loya made the schedule for the drivers and he managed to assign me to work alone with him on Sundays. There was some Sundays Mr. Loya would claim there was no loads. He went on to persuade me to help him with his paper work. I told him it was not my job. He then would say that I was still getting paid for waiting for loads.

7. On a Sunday Mr. Loya forced a kiss on me while I did his paper work. I quickly got up and left. He started to apologize as I left.

8. Three days later during the week he started to bother me more. Several times, if I was sitting down he would cross his whole leg over the back side of the chair I was sitting on and try to fit himself between the chair and me. I would quickly get up and I felt so uncomfortable and I just go to check my truck or clean the windows or just be in my truck rather than the driver's room to avoid him. In the next safety meeting I spoke up about it

9. If I was standing he would come from behind me and put his hands on my waist or his hands over my shoulders or would poke me with his fingers on the sides of my abdomen. Humberto Muniz and Freddy

4-9

Perez saw and they defended me. Freddy told Mr. Loya "no te va a hacer caso vato" "dejala" and Humberto said "es cierto no te va a hacer caso!"

A.  Humberto Muniz, Driver for Coastal Transport Co. Inc.
        802 N. Expressway Hwy. 77
        Harlingen, TX 78550
        1-800-372-4105

B.  Freddy Perez, Driver for PETROCHEM TRANSPORT INC.
        1307 N. FM. 509
        Harlingen, TX 78550
        (956) 364-0186

10.  I felt afraid of his revenge of what he did to other drivers
    A.  He would tell them, "Don't come tomorrow."
    B.  He would give drivers low paying loads.
    C.  He would also tell them to "bring the barbecue, its almost your turn."
    D.  He made a collection of money from drivers in order to pay for his beer.
    E.  He wanted gifts from others in order to keep their jobs and I wasn't going to give in.

MEMORANDUM
FOR PERSONNEL FILE

TO:      MANUAL LOYA

FROM:    Tony Culpepper

DATE:    9/3/97

RE:      Discussion on Friday, August 29, 1997

This letter is to follow up with our conversation on Friday, August 29, 1997. To recap our conversation, it is imperative that you conduct yourself in a completely professional manner. Do not allow personalities to influence your business decisions. Talk on the radio, black boards, and bulletin boards, etc. should be limited to business only. When at all possible, you need to have a witness present when interacting with employee's of the opposite sex. If you ever have an occasion to counsel an employee of the opposite sex , it is a must that you have a witness present. Dispatch will be done fairly and equitably regardless of personal feelings toward a driver. All incidents will be properly documented, failure to do so will lead to severe disciplinary action.

As you are well aware, that CTCO, has a stated policy, of which we have included a copy, pertaining sexual harassment. Should we become aware of a substantive claim against you of such behavior you will be subject to nmediate termination. Please sign below to acknowledge receipt of this letter and a copy of CTCO sexual harassment policy.


_____          _7-4-57_____
Acknowledge of Receipt                    Date
Manual Loya



Olm~S
EXHIBIT NO. __9__
3-33-01
BRYANT & STINGLEY, INC.